# McCLESKEY v. KEMP, SUPERINTENDENT, GEORGIA DIAGNOSTIC AND CLASSIFICATION CENTER

No. 84–6811. Argued October 15, 1986—Decided April 22, 1987

280

282

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion in which MARSHALL, J., joined, and in all but Part I of which BLACKMUN and STEVENS, JJ., joined, *post*, p. 320. BLACKMUN, J., filed a dissenting opinion in which MARSHALL and STEVENS, JJ., joined, and in all but Part IV–B of which BRENNAN, J., joined, *post*, p. 345. STEVENS, J., filed a dissenting opinion in which BLACKMUN, J., joined, *post*, p. 366.

*John Charles Boger* argued the cause for petitioner. With him on the briefs were *Julius L. Chambers, James M. Nabrit III, Vivian Berger, Robert H. Stroup, Timothy K. Ford,* and *Anthony G. Amsterdam.*

*Mary Beth Westmoreland,* Assistant Attorney General of Georgia, argued the cause for respondent. With her on the brief were *Michael J. Bowers,* Attorney General, *Marion O. Gordon,* First Assistant Attorney General, and *William B. Hill, Jr.,* Senior Assistant Attorney General.\*

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether a complex statistical study that indicates a risk that racial considerations enter

---

\*Briefs of *amici curiae* urging reversal were filed for the Congressional Black Caucus et al. by *Seth P. Waxman, Harold R. Tyler, Jr., James Robertson, Norman Redlich, William L. Robinson,* and *Grover Hankins;* and for the International Human Rights Law Group by *Ralph G. Steinhardt.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Ira Reiner, Harry B. Sondheim, John K. Van de Kamp,* Attorney General, *Michael C. Wellington,* Supervising Deputy Attorney General, and *Susan Lee Frierson,* Deputy Attorney General; and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *George C. Smith.*

*Martin F. Richman* filed a brief for Dr. Franklin M. Fisher et al. as *amici curiae.*

into capital sentencing determinations proves that petitioner McCleskey's capital sentence is unconstitutional under the Eighth or Fourteenth Amendment.

## I

McCleskey, a black man, was convicted of two counts of armed robbery and one count of murder in the Superior Court of Fulton County, Georgia, on October 12, 1978. McCleskey's convictions arose out of the robbery of a furniture store and the killing of a white police officer during the course of the robbery. The evidence at trial indicated that McCleskey and three accomplices planned and carried out the robbery. All four were armed. McCleskey entered the front of the store while the other three entered the rear. McCleskey secured the front of the store by rounding up the customers and forcing them to lie face down on the floor. The other three rounded up the employees in the rear and tied them up with tape. The manager was forced at gunpoint to turn over the store receipts, his watch, and $6. During the course of the robbery, a police officer, answering a silent alarm, entered the store through the front door. As he was walking down the center aisle of the store, two shots were fired. Both struck the officer. One hit him in the face and killed him.

Several weeks later, McCleskey was arrested in connection with an unrelated offense. He confessed that he had participated in the furniture store robbery, but denied that he had shot the police officer. At trial, the State introduced evidence that at least one of the bullets that struck the officer was fired from a .38 caliber Rossi revolver. This description matched the description of the gun that McCleskey had carried during the robbery. The State also introduced the testimony of two witnesses who had heard McCleskey admit to the shooting.

The jury convicted McCleskey of murder.[1] At the penalty hearing,[2] the jury heard arguments as to the appropriate sentence. Under Georgia law, the jury could not consider imposing the death penalty unless it found beyond a reasonable doubt that the murder was accompanied by one of the statutory aggravating circumstances. Ga. Code Ann. § 17–10–30(c) (1982).[3] The jury in this case found two ag-

---

[1] The Georgia Code has been revised and renumbered since McCleskey's trial. The changes do not alter the substance of the sections relevant to this case. For convenience, references in this opinion are to the current sections.

The Georgia Code contains only one degree of murder. A person commits murder "when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." Ga. Code Ann. § 16–5–1(a) (1984). A person convicted of murder "shall be punished by death or by imprisonment for life." § 16–5–1(d).

[2] Georgia Code Ann. § 17–10–2(c) (1982) provides that when a jury convicts a defendant of murder, "the court shall resume the trial and conduct a presentence hearing before the jury." This subsection suggests that a defendant convicted of murder always is subjected to a penalty hearing at which the jury considers imposing a death sentence. But as a matter of practice, penalty hearings seem to be held only if the prosecutor affirmatively seeks the death penalty. If he does not, the defendant receives a sentence of life imprisonment. See Baldus, Pulaski, & Woodworth, Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience, 74 J. Crim. L. & C. 661, 674, n. 56 (1983).

[3] A jury cannot sentence a defendant to death for murder unless it finds that one of the following aggravating circumstances exists beyond a reasonable doubt:

"(1) The offense . . . was committed by a person with a prior record of conviction for a capital felony;

"(2) The offense . . . was committed while the offender was engaged in the commission of another capital felony or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree;

"(3) The offender, by his act of murder . . . knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

"(4) The offender committed the offense . . . for himself or another, for the purpose of receiving money or any other thing of monetary value;

gravating circumstances to exist beyond a reasonable doubt: the murder was committed during the course of an armed robbery, § 17–10–30(b)(2); and the murder was committed upon a peace officer engaged in the performance of his duties, § 17–10–30(b)(8). In making its decision whether to impose the death sentence, the jury considered the mitigating and aggravating circumstances of McCleskey's conduct. § 17–10–2(c). McCleskey offered no mitigating evidence. The jury recommended that he be sentenced to death on the murder charge and to consecutive life sentences on the armed robbery charges. The court followed the jury's recommendation and sentenced McCleskey to death.[4]

On appeal, the Supreme Court of Georgia affirmed the convictions and the sentences. *McCleskey* v. *State*, 245 Ga. 108, 263 S. E. 2d 146 (1980). This Court denied a petition for a writ of certiorari. *McCleskey* v. *Georgia*, 449 U. S. 891 (1980). The Superior Court of Fulton County denied McCleskey's extraordinary motion for a new trial. McCleskey then filed a petition for a writ of habeas corpus in the

---

"(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor, or former district attorney or solicitor was commmitted during or because of the exercise of his official duties;

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person;

"(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim;

"(8) The offense . . . was committed against any peace officer, corrections employee, or fireman while engaged in the performance of his official duties;

"(9) The offense . . . was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement; or

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." § 17–10–30(b).

[4] Georgia law provides that "[w]here a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death." § 17–10–31.

Superior Court of Butts County. After holding an evidentiary hearing, the Superior Court denied relief. *McCleskey* v. *Zant*, No. 4909 (Apr. 8, 1981). The Supreme Court of Georgia denied McCleskey's application for a certificate of probable cause to appeal the Superior Court's denial of his petition, No. 81–5523, and this Court again denied certiorari. *McCleskey* v. *Zant*, 454 U. S. 1093 (1981).

McCleskey next filed a petition for a writ of habeas corpus in the Federal District Court for the Northern District of Georgia. His petition raised 18 claims, one of which was that the Georgia capital sentencing process is administered in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In support of his claim, McCleskey proffered a statistical study performed by Professors David C. Baldus, Charles Pulaski, and George Woodworth (the Baldus study) that purports to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant. The Baldus study is actually two sophisticated statistical studies that examine over 2,000 murder cases that occurred in Georgia during the 1970's. The raw numbers collected by Professor Baldus indicate that defendants charged with killing white persons received the death penalty in 11% of the cases, but defendants charged with killing blacks received the death penalty in only 1% of the cases. The raw numbers also indicate a reverse racial disparity according to the race of the defendant: 4% of the black defendants received the death penalty, as opposed to 7% of the white defendants.

Baldus also divided the cases according to the combination of the race of the defendant and the race of the victim. He found that the death penalty was assessed in 22% of the cases involving black defendants and white victims; 8% of the cases involving white defendants and white victims; 1% of the cases involving black defendants and black victims; and 3% of the cases involving white defendants and black victims.

Similarly, Baldus found that prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims; 32% of the cases involving white defendants and white victims; 15% of the cases involving black defendants and black victims; and 19% of the cases involving white defendants and black victims.

Baldus subjected his data to an extensive analysis, taking account of 230 variables that could have explained the disparities on nonracial grounds. One of his models concludes that, even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks. According to this model, black defendants were 1.1 times as likely to receive a death sentence as other defendants. Thus, the Baldus study indicates that black defendants, such as McCleskey, who kill white victims have the greatest likelihood of receiving the death penalty.[5]

The District Court held an extensive evidentiary hearing on McCleskey's petition. Although it believed that McCleskey's Eighth Amendment claim was foreclosed by the Fifth Circuit's decision in *Spinkellink* v. *Wainwright*, 578 F. 2d 582, 612–616 (1978), cert. denied, 440 U. S. 976 (1979), it nevertheless considered the Baldus study with care. It con-

---

[5] Baldus' 230-variable model divided cases into eight different ranges, according to the estimated aggravation level of the offense. Baldus argued in his testimony to the District Court that the effects of racial bias were most striking in the midrange cases. "[W]hen the cases become tremendously aggravated so that everybody would agree that if we're going to have a death sentence, these are the cases that should get it, the race effects go away. It's only in the mid-range of cases where the decision-makers have a real choice as to what to do. If there's room for the exercise of discretion, then the [racial] factors begin to play a role." App. 36. Under this model, Baldus found that 14.4% of the black-victim midrange cases received the death penalty, and 34.4% of the white-victim cases received the death penalty. See Exhibit DB 90, reprinted in Supplemental Exhibits 54. According to Baldus, the facts of McCleskey's case placed it within the midrange. App. 45–46.

cluded that McCleskey's "statistics do not demonstrate a prima facie case in support of the contention that the death penalty was imposed upon him because of his race, because of the race of the victim, or because of any Eighth Amendment concern." *McCleskey* v. *Zant,* 580 F. Supp. 338, 379 (ND Ga. 1984). As to McCleskey's Fourteenth Amendment claim, the court found that the methodology of the Baldus study was flawed in several respects.[6] Because of these de-

---

[6] Baldus, among other experts, testified at the evidentiary hearing. The District Court "was impressed with the learning of all of the experts." 580 F. Supp., at 353 (emphasis omitted). Nevertheless, the District Court noted that in many respects the data were incomplete. In its view, the questionnaires used to obtain the data failed to capture the full degree of the aggravating or mitigating circumstances. *Id.,* at 356. The court criticized the researcher's decisions regarding unknown variables. *Id.,* at 357–358. The researchers could not discover whether penalty trials were held in many of the cases, thus undercutting the value of the study's statistics as to prosecutorial decisions. *Id.,* at 359. In certain cases, the study lacked information on the race of the victim in cases involving multiple victims, on whether or not the prosecutor offered a plea bargain, and on credibility problems with witnesses. *Id.,* at 360. The court concluded that McCleskey had failed to establish by a preponderance of the evidence that the data were trustworthy. "It is a major premise of a statistical case that the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." *Ibid.*

The District Court noted other problems with Baldus' methodology. First, the researchers assumed that all of the information available from the questionnaires was available to the juries and prosecutors when the case was tried. The court found this assumption "questionable." *Id.,* at 361. Second, the court noted the instability of the various models. Even with the 230-variable model, consideration of 20 further variables caused a significant drop in the statistical significance of race. In the court's view, this undermined the persuasiveness of the model that showed the greatest racial disparity, the 39-variable model. *Id.,* at 362. Third, the court found that the high correlation between race and many of the nonracial variables diminished the weight to which the study was entitled. *Id.,* at 363–364.

Finally, the District Court noted the inability of any of the models to predict the outcome of actual cases. As the court explained, statisticians use

fects, the court held that the Baldus study "fail[ed] to contribute anything of value" to McCleskey's claim. *Id.*, at 372 (emphasis omitted). Accordingly, the court denied the petition insofar as it was based upon the Baldus study.

The Court of Appeals for the Eleventh Circuit, sitting en banc, carefully reviewed the District Court's decision on McCleskey's claim. 753 F. 2d 877 (1985). It assumed the validity of the study itself and addressed the merits of McCleskey's Eighth and Fourteenth Amendment claims. That is, the court assumed that the study "showed that systematic and substantial disparities existed in the penalties imposed upon homicide defendants in Georgia based on race of the homicide victim, that the disparities existed at a less substantial rate in death sentencing based on race of defendants, and that the factors of race of the victim and defendant were at work in Fulton County." *Id.*, at 895. Even assuming the study's validity, the Court of Appeals found the statistics "insufficient to demonstrate discriminatory intent or unconstitutional discrimination in the Fourteenth Amendment context, [and] insufficient to show irrationality, arbitrariness and capriciousness under any kind of Eighth Amendment analysis." *Id.*, at 891. The court noted:

> "The very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates. Assuming each result is within the range of discretion, all are correct in the eyes of the law. It would not make sense for the system to require the exercise of discretion in order to be facially constitu-

a measure called an "$r^2$" to measure what portion of the variance in the dependent variable (death sentencing rate, in this case) is accounted for by the independent variables of the model. A perfectly predictive model would have an $r^2$ value of 1.0. A model with no predictive power would have an $r^2$ value of 0. The $r^2$ value of Baldus' most complex model, the 230-variable model, was between .46 and .48. Thus, as the court explained, "the 230-variable model does not predict the outcome in half of the cases." *Id.*, at 361.

tional, and at the same time hold a system unconstitutional in application where that discretion achieved different results for what appear to be exact duplicates, absent the state showing the reasons for the difference. . . .

"The Baldus approach . . . would take the cases with different results on what are contended to be duplicate facts, where the differences could not be otherwise explained, and conclude that the different result was based on race alone. . . . This approach ignores the realities. . . . There are, in fact, no exact duplicates in capital crimes and capital defendants. The type of research submitted here tends to show which of the directed factors were effective, but is of restricted use in showing what undirected factors control the exercise of constitutionally required discretion." *Id.*, at 898–899.

The court concluded:

"Viewed broadly, it would seem that the statistical evidence presented here, assuming its validity, confirms rather than condemns the system. . . . The marginal disparity based on the race of the victim tends to support the state's contention that the system is working far differently from the one which *Furman* [v. *Georgia*, 408 U. S. 238 (1972)] condemned. In pre-*Furman* days, there was no rhyme or reason as to who got the death penalty and who did not. But now, in the vast majority of cases, the reasons for a difference are well documented. That they are not so clear in a small percentage of the cases is no reason to declare the entire system unconstitutional." *Id.*, at 899.

The Court of Appeals affirmed the denial by the District Court of McCleskey's petition for a writ of habeas corpus insofar as the petition was based upon the Baldus study, with three judges dissenting as to McCleskey's claims based on

the Baldus study. We granted certiorari, 478 U. S. 1019 (1986), and now affirm.

## II

McCleskey's first claim is that the Georgia capital punishment statute violates the Equal Protection Clause of the Fourteenth Amendment.[7] He argues that race has infected the administration of Georgia's statute in two ways: persons who murder whites are more likely to be sentenced to death than persons who murder blacks, and black murderers are more likely to be sentenced to death than white murderers.[8]

---

[7] Although the District Court rejected the findings of the Baldus study as flawed, the Court of Appeals assumed that the study is valid and reached the constitutional issues. Accordingly, those issues are before us. As did the Court of Appeals, we assume the study is valid statistically without reviewing the factual findings of the District Court. Our assumption that the Baldus study is statistically valid does not include the assumption that the study shows that racial considerations actually enter into any sentencing decisions in Georgia. Even a sophisticated multiple-regression analysis such as the Baldus study can only demonstrate a *risk* that the factor of race entered into some capital sentencing decisions and a necessarily lesser risk that race entered into any particular sentencing decision.

[8] Although McCleskey has standing to claim that he suffers discrimination because of his own race, the State argues that he has no standing to contend that he was discriminated against on the basis of his victim's race. While it is true that we are reluctant to recognize "standing to assert the rights of third persons," *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 263 (1977), this does not appear to be the nature of McCleskey's claim. He does not seek to assert some right of his victim, or the rights of black murder victims in general. Rather, McCleskey argues that application of the State's statute has created a classification that is "an irrational exercise of governmental power," Brief for Petitioner 41, because it is not "necessary to the accomplishment of some permissible state objective." *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967). See *McGowan* v. *Maryland*, 366 U. S. 420, 425 (1961) (statutory classification cannot be "wholly irrelevant to the achievement of the State's objective"). It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962). See

As a black defendant who killed a white victim, McCleskey claims that the Baldus study demonstrates that he was discriminated against because of his race and because of the race of his victim. In its broadest form, McCleskey's claim of discrimination extends to every actor in the Georgia capital sentencing process, from the prosecutor who sought the death penalty and the jury that imposed the sentence, to the State itself that enacted the capital punishment statute and allows it to remain in effect despite its allegedly discriminatory application. We agree with the Court of Appeals, and every other court that has considered such a challenge,[9] that this claim must fail.

### A

Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." *Whitus* v. *Georgia*, 385 U. S. 545, 550 (1967).[10] A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. *Wayte* v. *United States*, 470 U. S. 598, 608 (1985). Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in *his* case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that racial

---

*Cleveland Bd. of Ed.* v. *Lafleur*, 414 U. S. 632, 652–653 (1974) (POWELL, J., concurring). Because McCleskey raises such a claim, he has standing.

[9] See, *e. g., Shaw* v. *Martin*, 733 F. 2d 304, 311–314 (CA4), cert. denied, 469 U. S. 873 (1984); *Adams* v. *Wainwright*, 709 F. 2d 1443 (CA11 1983) *(per curiam)*, cert. denied, 464 U. S. 1063 (1984); *Smith* v. *Balkcom*, 660 F. 2d 573, 584–585, modified, 671 F. 2d 858, 859–860 (CA5 Unit B 1981) *(per curiam)*, cert. denied, 459 U. S. 882 (1982); *Spinkellink* v. *Wainwright*, 578 F. 2d 582, 612–616 (CA5 1978), cert. denied, 440 U. S. 976 (1979).

[10] See *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 265; *Washington* v. *Davis*, 426 U. S. 229, 240 (1976).

considerations played a part in his sentence. Instead, he relies solely on the Baldus study.[11] McCleskey argues that the Baldus study compels an inference that his sentence rests on purposeful discrimination. McCleskey's claim that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case, would extend to all capital cases in Georgia, at least where the victim was white and the defendant is black.

The Court has accepted statistics as proof of intent to discriminate in certain limited contexts. First, this Court has accepted statistical disparities as proof of an equal protection violation in the selection of the jury venire in a particular district. Although statistical proof normally must present a "stark" pattern to be accepted as the sole proof of discriminatory intent under the Constitution,[12] *Arlington Heights* v.

---

[11] McCleskey's expert testified:

"Models that are developed talk about the effect on the average. They do not depict the experience of a single individual. What they say, for example, [is] that on the average, the race of the victim, if it is white, increases on the average the probability . . . (that) the death sentence would be given.

"Whether in a given case that is the answer, it cannot be determined from statistics." 580 F. Supp., at 372.

[12] *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), and *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886), are examples of those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation. In *Gomillion,* a state legislature violated the Fifteenth Amendment by altering the boundaries of a particular city "from a square to an uncouth twenty-eight-sided figure." 364 U. S., at 340. The alterations excluded 395 of 400 black voters without excluding a single white voter. In *Yick Wo,* an ordinance prohibited operation of 310 laundries that were housed in wooden buildings, but allowed such laundries to resume operations if the operator secured a permit from the government. When laundry operators applied for permits to resume operation, all but one of the white applicants received permits, but none of the over 200 Chinese applicants were successful. In those cases, the Court found the statistical disparities "to warrant and require," *Yick Wo* v. *Hopkins, supra,* at 373, a "conclusion [that

*Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 266 (1977), "[b]ecause of the nature of the jury-selection task, . . . we have permitted a finding of constitutional violation even when the statistical pattern does not approach [such] extremes." *Id.*, at 266, n. 13.[13] Second, this Court has accepted statistics in the form of multiple-regression analysis to prove statutory violations under Title VII of the Civil Rights Act of 1964. *Bazemore* v. *Friday*, 478 U. S. 385, 400–401 (1986) (opinion of BRENNAN, J., concurring in part).

But the nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different from the corresponding elements in the venire-selection or Title VII cases. Most importantly, each particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire. Each jury is unique in its composition, and the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense. See *Hitchcock* v. *Dugger, post*, at 398–399; *Lockett* v. *Ohio*, 438 U. S. 586, 602–605 (1978) (plurality opinion of Burger, C. J.). Thus, the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-

---

was] irresistible, tantamount for all practical purposes to a mathematical demonstration," *Gomillion* v. *Lightfoot, supra*, at 341, that the State acted with a discriminatory purpose.

[13] See, *e. g., Castaneda* v. *Partida*, 430 U. S. 482, 495 (1977) (2-to-1 disparity between Mexican-Americans in county population and those summoned for grand jury duty); *Turner* v. *Fouche*, 396 U. S. 346, 359 (1970) (1.6-to-1 disparity between blacks in county population and those on grand jury lists); *Whitus* v. *Georgia*, 385 U. S. 545, 552 (1967) (3-to-1 disparity between eligible blacks in county and blacks on grand jury venire).

selection or Title VII case. In those cases, the statistics relate to fewer entities,[14] and fewer variables are relevant to the challenged decisions.[15]

---

[14] In venire-selection cases, the factors that may be considered are limited, usually by state statute. See *Castaneda* v. *Partida, supra,* at 485 ("A grand juror must be a citizen of Texas and of the county, be a qualified voter in the county, be 'of sound mind and good moral character,' be literate, have no prior felony conviction, and be under no pending indictment 'or other legal accusation for theft or of any felony' "); *Turner* v. *Fouche, supra,* at 354 (jury commissioners may exclude any not "upright" and "intelligent" from grand jury service); *Whitus* v. *Georgia, supra,* at 548 (same). These considerations are uniform for all potential jurors, and although some factors may be said to be subjective, they are limited and, to a great degree, objectively verifiable. While employment decisions may involve a number of relevant variables, these variables are to a great extent uniform for all employees because they must all have a reasonable relationship to the employee's qualifications to perform the particular job at issue. Identifiable qualifications for a single job provide a common standard by which to assess each employee. In contrast, a capital sentencing jury may consider *any* factor relevant to the defendant's background, character, and the offense. See *Eddings* v. *Oklahoma,* 455 U. S. 104, 112 (1982). There is no common standard by which to evaluate all defendants who have or have not received the death penalty.

[15] We refer here not to the number of entities involved in any particular decision, but to the number of entities whose decisions necessarily are reflected in a statistical display such as the Baldus study. The decisions of a jury commission or of an employer over time are fairly attributable to the commission or the employer. Therefore, an unexplained statistical discrepancy can be said to indicate a consistent policy of the decisionmaker. The Baldus study seeks to deduce a state "policy" by studying the combined effects of the decisions of hundreds of juries that are unique in their composition. It is incomparably more difficult to deduce a consistent policy by studying the decisions of these many unique entities. It is also questionable whether any consistent policy can be derived by studying the decisions of prosecutors. The District Attorney is elected by the voters in a particular county. See Ga. Const., Art. 6, § 8, ¶ 1. Since decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations, coordination among district attorney offices across a State would be relatively meaningless. Thus, any inference from statewide statistics to a prosecutorial "policy" is of doubtful rele-

Another important difference between the cases in which we have accepted statistics as proof of discriminatory intent and this case is that, in the venire-selection and Title VII contexts, the decisionmaker has an opportunity to explain the statistical disparity. See *Whitus* v. *Georgia,* 385 U. S., at 552; *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 254 (1981); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802 (1973). Here, the State has no practical opportunity to rebut the Baldus study. "[C]ontrolling considerations of . . . public policy," *McDonald* v. *Pless,* 238 U. S. 264, 267 (1915), dictate that jurors "cannot be called . . . to testify to the motives and influences that led to their verdict." *Chicago, B. & Q. R. Co.* v. *Babcock,* 204 U. S. 585, 593 (1907). Similarly, the policy considerations behind a prosecutor's traditionally "wide discretion"[16] suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, "often years after they were made."[17] See *Imbler* v. *Pachtman,* 424 U. S. 409, 425–426 (1976).[18] Moreover, absent far stronger proof, it is unnec-

vance. Moreover, the statistics in Fulton County alone represent the disposition of far fewer cases than the statewide statistics. Even assuming the statistical validity of the Baldus study as a whole, the weight to be given the results gleaned from this small sample is limited.

[16] See *Wayte* v. *United States,* 470 U. S. 598, 607 (1985); *United States* v. *Goodwin,* 457 U. S. 368, 380, n. 11 (1982); *Bordenkircher* v. *Hayes,* 434 U. S. 357, 365 (1978). See also ABA Standards for Criminal Justice 3–3.8, 3–3.9 (2d ed. 1982).

[17] Requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts. See *Batson* v. *Kentucky,* 476 U. S. 79 (1986).

[18] Although *Imbler* was decided in the context of damages actions under 42 U. S. C. § 1983 brought against prosecutors, the considerations that led the Court to hold that a prosecutor should not be required to explain his decisions apply in this case as well: "[I]f the prosecutor could be made to answer in court each time . . . a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law." 424 U. S., at 425. Our refusal to require that the prosecutor provide an explanation for his decisions in this case is completely consistent with this Court's longstanding precedents that hold that a prosecutor

essary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty.[19]

Finally, McCleskey's statistical proffer must be viewed in the context of his challenge. McCleskey challenges decisions at the heart of the State's criminal justice system. "[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder." *Gregg* v. *Georgia*, 428 U. S. 153, 226 (1976) (WHITE, J., concurring). Implementation of these laws necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study. Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose.

## B

McCleskey also suggests that the Baldus study proves that the State as a whole has acted with a discriminatory purpose. He appears to argue that the State has violated the Equal

---

need not explain his decisions unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to his case. See, *e. g., Batson* v. *Kentucky, supra; Wayte* v. *United States, supra.*

[19] In his dissent, JUSTICE BLACKMUN misreads this statement. See *post,* at 348–349. We do not suggest that McCleskey's conviction and sentencing by a jury bears on the prosecutor's motivation. Rather, the fact that the United States Constitution and the laws of Georgia authorized the prosecutor to seek the death penalty under the circumstances of this case *is* a relevant factor to be weighed in determining whether the Baldus study demonstrates a constitutionally significant risk that this decision was motivated by racial considerations.

Protection Clause by adopting the capital punishment statute and allowing it to remain in force despite its allegedly discriminatory application. But " '[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256, 279 (1979) (footnote and citation omitted). See *Wayte* v. *United States,* 470 U. S., at 608–609. For this claim to prevail, McCleskey would have to prove that the Georgia Legislature enacted or maintained the death penalty statute *because of* an anticipated racially discriminatory effect. In *Gregg* v. *Georgia, supra,* this Court found that the Georgia capital sentencing system could operate in a fair and neutral manner. There was no evidence then, and there is none now, that the Georgia Legislature enacted the capital punishment statute to further a racially discriminatory purpose.[20]

Nor has McCleskey demonstrated that the legislature maintains the capital punishment statute because of the racially disproportionate impact suggested by the Baldus study. As legislatures necessarily have wide discretion in the choice of criminal laws and penalties, and as there were

---

[20] McCleskey relies on "historical evidence" to support his claim of purposeful discrimination by the State. This evidence focuses on Georgia laws in force during and just after the Civil War. Of course, the "historical background of the decision is one evidentiary source" for proof of intentional discrimination. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S., at 267. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. Cf. *Hunter* v. *Underwood,* 471 U. S. 222, 228–233 (1985) (relying on legislative history to demonstrate discriminatory motivation behind state statute). Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent.

legitimate reasons for the Georgia Legislature to adopt and maintain capital punishment, see *Gregg* v. *Georgia, supra,* at 183–187 (joint opinion of Stewart, POWELL, and STEVENS, JJ.), we will not infer a discriminatory purpose on the part of the State of Georgia.[21] Accordingly, we reject McCleskey's equal protection claims.

## III

McCleskey also argues that the Baldus study demonstrates that the Georgia capital sentencing system violates the Eighth Amendment.[22] We begin our analysis of this claim by reviewing the restrictions on death sentences established by our prior decisions under that Amendment.

## A

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." This Court's early Eighth Amendment cases examined only the "particular methods of execution to determine whether they were too cruel to pass constitutional muster." *Gregg* v. *Georgia, supra,* at 170. See *In re Kemmler,* 136 U. S. 436 (1890) (electrocution);

---

[21] JUSTICE BLACKMUN suggests that our "reliance on legitimate interests underlying the Georgia Legislature's enactment of its capital punishment statute is . . . inappropriate [because] it has no relevance in a case dealing with a challenge to the Georgia capital sentencing system *as applied* in McCleskey's case." *Post,* at 349 (emphasis in original). As the dissent suggests, this evidence is not particularly probative when assessing the application of Georgia's capital punishment system through the actions of prosecutors and juries, as we did in Part II–A, *supra.* But that is not the challenge that we are addressing here. As indicated above, the question we are addressing is whether the legislature maintains its capital punishment statute because of the racially disproportionate impact suggested by the Baldus study. McCleskey has introduced no evidence to support this claim. It is entirely appropriate to rely on the legislature's legitimate reasons for enacting and maintaining a capital punishment statute to address a challenge to the *legislature's* intent.

[22] The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Robinson* v. *California,* 370 U. S. 660, 667 (1962).

*Wilkerson* v. *Utah,* 99 U. S. 130 (1879) (public shooting). Subsequently, the Court recognized that the constitutional prohibition against cruel and unusual punishments "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States,* 217 U. S. 349, 378 (1910). In *Weems,* the Court identified a second principle inherent in the Eighth Amendment, "that punishment for crime should be graduated and proportioned to offense." *Id.,* at 367.

Chief Justice Warren, writing for the plurality in *Trop* v. *Dulles,* 356 U. S. 86, 99 (1958), acknowledged the constitutionality of capital punishment. In his view, the "basic concept underlying the Eighth Amendment" in this area is that the penalty must accord with "the dignity of man." *Id.,* at 100. In applying this mandate, we have been guided by his statement that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.,* at 101. Thus, our constitutional decisions have been informed by "contemporary values concerning the infliction of a challenged sanction," *Gregg* v. *Georgia,* 428 U. S., at 173. In assessing contemporary values, we have eschewed subjective judgment, and instead have sought to ascertain "objective indicia that reflect the public attitude toward a given sanction." *Ibid.* First among these indicia are the decisions of state legislatures, "because the . . . legislative judgment weighs heavily in ascertaining" contemporary standards, *id.,* at 175. We also have been guided by the sentencing decisions of juries, because they are "a significant and reliable objective index of contemporary values," *id.,* at 181. Most of our recent decisions as to the constitutionality of the death penalty for a particular crime have rested on such an examination of contemporary values. *E. g., Enmund* v. *Florida,* 458 U. S. 782, 789–796 (1982) (felony murder); *Coker* v. *Georgia,* 433 U. S. 584, 592–597 (1977) (plurality opinion of WHITE, J.) (rape); *Gregg* v. *Georgia, supra,* at 179–182 (murder).

## B

Two principal decisions guide our resolution of McCleskey's Eighth Amendment claim. In *Furman* v. *Georgia*, 408 U. S. 238 (1972), the Court concluded that the death penalty was so irrationally imposed that any particular death sentence could be presumed excessive. Under the statutes at issue in *Furman*, there was no basis for determining in any particular case whether the penalty was proportionate to the crime: "[T]he death penalty [was] exacted with great infrequency even for the most atrocious crimes and . . . there [was] no meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not." *Id.*, at 313 (WHITE, J., concurring).

In *Gregg*, the Court specifically addressed the question left open in *Furman*—whether the punishment of death for murder is "under all circumstances, 'cruel and unusual' in violation of the Eighth and Fourteenth Amendments of the Constitution." 428 U. S., at 168. We noted that the imposition of the death penalty for the crime of murder "has a long history of acceptance both in the United States and in England." *Id.*, at 176 (joint opinion of Stewart, POWELL, and STEVENS, JJ.). "The most marked indication of society's endorsement of the death penalty for murder [was] the legislative response to *Furman*." *Id.*, at 179. During the 4-year period between *Furman* and *Gregg*, at least 35 States had reenacted the death penalty, and Congress had authorized the penalty for aircraft piracy. 428 U. S., at 179–180.[23] The "actions of juries" were "fully compatible with the legislative judgments." *Id.*, at 182. We noted that any punishment might be unconstitutionally severe if inflicted without penological justification, but concluded:

---

[23] Thirty-seven States now have capital punishment statutes that were enacted since our decision in *Furman*. Thirty-three of these States have imposed death sentences under the new statutes. NAACP Legal Defense and Educational Fund, Death Row, U. S. A. 1 (Oct. 1, 1986). A federal statute, amended in relevant part in 1974, authorizes the death penalty for aircraft piracy in which a death occurs. 49 U. S. C. App. § 1472(i)(1)(b).

"Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe." *Id.*, at 186–187.

The second question before the Court in *Gregg* was the constitutionality of the particular procedures embodied in the Georgia capital punishment statute. We explained the fundamental principle of *Furman*, that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U. S., at 189. Numerous features of the then new Georgia statute met the concerns articulated in *Furman*.[24] The Georgia system bifurcates guilt and sentencing proceedings so that the jury can receive all relevant information for sentencing without the risk that evidence irrelevant to the defendant's guilt will influence the jury's consideration of that issue. The statute narrows the class of murders subject to the death penalty to cases in which the jury finds at least one statutory aggravating circumstance beyond a reasonable doubt. Conversely, it allows the defendant to introduce any relevant mitigating evidence that might influence the jury not to impose a death sentence. See 428 U. S., at 163–164. The procedures also require a particularized inquiry into "'the circumstances of the offense together with the character and propensities of the offender.'" *Id.*, at 189 (quoting *Pennsylvania ex rel. Sullivan* v. *Ashe*, 302 U. S. 51, 55 (1937)). Thus, "while some jury discretion still exists, 'the

---

[24] We have noted that the Georgia statute generally follows the standards of the ALI Model Penal Code § 201.6 (Proposed Official Draft No. 13, 1961). *Gregg* v. *Georgia*, 428 U. S., at 194, n. 44.

discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application.'" 428 U. S., at 197–198 (quoting *Coley* v. *State*, 231 Ga. 829, 834, 204 S. E. 2d 612, 615 (1974)). Moreover, the Georgia system adds "an important additional safeguard against arbitrariness and caprice" in a provision for automatic appeal of a death sentence to the State Supreme Court. 428 U. S., at 198. The statute requires that court to review each sentence to determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate to sentences imposed in generally similar murder cases. To aid the court's review, the trial judge answers a questionnaire about the trial, including detailed questions as to "the quality of the defendant's representation [and] whether race played a role in the trial." *Id.*, at 167.

## C

In the cases decided after *Gregg*, the Court has imposed a number of requirements on the capital sentencing process to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in *Gregg*. In *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), we invalidated a mandatory capital sentencing system, finding that the "respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.*, at 304 (plurality opinion of Stewart, POWELL, and STEVENS, JJ.) (citation omitted). Similarly, a State must "narrow the class of murderers subject to capital punishment," *Gregg* v. *Georgia, supra,* at 196, by providing "specific and detailed guidance" to the sentencer.[25]

[25] Although the Court has recognized that jury sentencing in a capital case "can perform an important societal function," *Proffitt* v. *Florida*, 428

*Proffitt* v. *Florida*, 428 U. S. 242, 253 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.).

In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.[26] "[T]he sentencer . . . [cannot] be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* v. *Ohio*, 438 U. S., at 604 (plurality opinion of Burger, C. J.) (emphasis in original; footnote omitted). See *Skipper* v. *South Carolina*, 476 U. S. 1 (1986). Any exclusion of the "compassionate or mitigating factors stemming from the diverse frailties of humankind" that are relevant to the sentencer's decision would fail to treat all persons as "uniquely individual human beings." *Woodson* v. *North Carolina*, *supra*, at 304.

Although our constitutional inquiry has centered on the procedures by which a death sentence is imposed, we have not stopped at the face of a statute, but have probed the appli-

---

U. S. 242, 252 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.) (citing *Witherspoon* v. *Illinois*, 391 U. S. 510, 519, n. 15 (1968)), it "has never suggested that jury sentencing [in a capital case] is constitutionally required." 428 U. S., at 252. Under the Florida capital punishment system at issue in *Proffitt*, the jury's verdict is only advisory. The trial judge determines the final sentence. Unlike in Georgia, a Florida trial judge may impose the death penalty even when the jury recommends otherwise. In *Proffitt*, we found that the Florida capital sentencing procedures adequately channeled the trial judge's discretion so that the Florida system, like the Georgia system, on its face "satisfie[d] the constitutional deficiencies identified in *Furman*." *Id.*, at 253.

[26] We have not yet decided whether the Constitution permits a mandatory death penalty in certain narrowly defined circumstances, such as when an inmate serving a life sentence without possibility of parole commits murder. See *Shuman* v. *Wolff*, 791 F. 2d 788 (CA9), cert. granted *sub nom. Sumner* v. *Shuman*, 479 U. S. 948 (1986).

cation of statutes to particular cases. For example, in *Godfrey* v. *Georgia*, 446 U. S. 420 (1980), the Court invalidated a Georgia Supreme Court interpretation of the statutory aggravating circumstance that the murder be "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code § 27–2534.1(b)(7) (1978).[27] Although that court had articulated an adequate limiting definition of this phrase, we concluded that its interpretation in *Godfrey* was so broad that it may have vitiated the role of the aggravating circumstance in guiding the sentencing jury's discretion.

Finally, where the objective indicia of community values have demonstrated a consensus that the death penalty is disproportionate as applied to a certain class of cases, we have established substantive limitations on its application. In *Coker* v. *Georgia*, 433 U. S. 584 (1977), the Court held that a State may not constitutionally sentence an individual to death for the rape of an adult woman. In *Enmund* v. *Florida*, 458 U. S. 782 (1982), the Court prohibited imposition of the death penalty on a defendant convicted of felony murder absent a showing that the defendant possessed a sufficiently culpable mental state. Most recently, in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), we prohibited execution of prisoners who are insane.

## D

In sum, our decisions since *Furman* have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportion-

---

[27] This section is substantially identical to the current Georgia Code Ann. § 17–10–30(b)(7) (1982), which is reprinted in n. 3, *supra*.

ate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.

## IV

### A

In light of our precedents under the Eighth Amendment, McCleskey cannot argue successfully that his sentence is "disproportionate to the crime in the traditional sense." See *Pulley* v. *Harris*, 465 U. S. 37, 43 (1984). He does not deny that he committed a murder in the course of a planned robbery, a crime for which this Court has determined that the death penalty constitutionally may be imposed. *Gregg* v. *Georgia*, 428 U. S., at 187. His disproportionality claim "is of a different sort." *Pulley* v. *Harris*, *supra*, at 43. McCleskey argues that the sentence in his case is disproportionate to the sentences in other murder cases.

On the one hand, he cannot base a constitutional claim on an argument that his case differs from other cases in which defendants *did* receive the death penalty. On automatic appeal, the Georgia Supreme Court found that McCleskey's death sentence was not disproportionate to other death sentences imposed in the State. *McCleskey* v. *State*, 245 Ga. 108, 263 S. E. 2d 146 (1980). The court supported this conclusion with an appendix containing citations to 13 cases involving generally similar murders. See Ga. Code Ann. § 17–10–35(e) (1982). Moreover, where the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required. *Pulley* v. *Harris*, *supra*, at 50–51.

On the other hand, absent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, McCleskey cannot prove a constitutional

violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty. In *Gregg*, the Court confronted the argument that "the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law," 428 U. S., at 199, specifically the opportunities for discretionary leniency, rendered the capital sentences imposed arbitrary and capricious. We rejected this contention:

> "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Ibid.*[28]

---

[28] The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentenc-

Because McCleskey's sentence was imposed under Georgia sentencing procedures that focus discretion "on the particularized nature of the crime and the particularized characteristics of the individual defendant," *id.*, at 206, we lawfully may presume that McCleskey's death sentence was not "wantonly and freakishly" imposed, *id.*, at 207, and thus that the sentence is not disproportionate within any recognized meaning under the Eighth Amendment.

## B

Although our decision in *Gregg* as to the facial validity of the Georgia capital punishment statute appears to foreclose McCleskey's disproportionality argument, he further contends that the Georgia capital punishment system is arbitrary and capricious in *application*, and therefore his sentence is excessive, because racial considerations may influence capital sentencing decisions in Georgia. We now address this claim.

To evaluate McCleskey's challenge, we must examine exactly what the Baldus study may show. Even Professor Baldus does not contend that his statistics *prove* that race enters into any capital sentencing decisions or that race was a factor in McCleskey's particular case.[29] Statistics at most may show only a likelihood that a particular factor entered into some decisions. There is, of course, some risk of racial prejudice influencing a jury's decision in a criminal case. There are similar risks that other kinds of prejudice will influence other criminal trials. See *infra*, at 315–318. The question

---

ing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

[29] According to Professor Baldus:

"McCleskey's case falls in [a] grey area where . . . you would find the greatest likelihood that some inappropriate consideration may have come to bear on the decision.

"In an analysis of this type, obviously one cannot say that we can say to a moral certainty what it was that influenced the decision. We can't do that." App. 45–46.

"is at what point that risk becomes constitutionally unacceptable," *Turner* v. *Murray*, 476 U. S. 28, 36, n. 8 (1986). McCleskey asks us to accept the likelihood allegedly shown by the Baldus study as the constitutional measure of an unacceptable risk of racial prejudice influencing capital sentencing decisions. This we decline to do.

Because of the risk that the factor of race may enter the criminal justice process, we have engaged in "unceasing efforts" to eradicate racial prejudice from our criminal justice system. *Batson* v. *Kentucky*, 476 U. S. 79, 85 (1986).[30] Our efforts have been guided by our recognition that "the inestimable privilege of trial by jury . . . is a vital principle, underlying the whole administration of criminal justice," *Ex parte Milligan*, 4 Wall. 2, 123 (1866). See *Duncan* v.

---

[30] This Court has repeatedly stated that prosecutorial discretion cannot be exercised on the basis of race. *Wayte* v. *United States*, 470 U. S., at 608; *United States* v. *Batchelder*, 442 U. S. 114 (1979); *Oyler* v. *Boles*, 368 U. S. 448 (1962). Nor can a prosecutor exercise peremptory challenges on the basis of race. *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Swain* v. *Alabama*, 380 U. S. 202 (1965). More generally, this Court has condemned state efforts to exclude blacks from grand and petit juries. *Vasquez* v. *Hillery*, 474 U. S. 254 (1986); *Alexander* v. *Louisiana*, 405 U. S. 625, 628–629 (1972); *Whitus* v. *Georgia*, 385 U. S., at 549–550; *Norris* v. *Alabama*, 294 U. S. 587, 589 (1935); *Neal* v. *Delaware*, 103 U. S. 370, 394 (1881); *Strauder* v. *West Virginia*, 100 U. S. 303, 308 (1880); *Ex parte Virginia*, 100 U. S. 339 (1880).

Other protections apply to the trial and jury deliberation process. Widespread bias in the community can make a change of venue constitutionally required. *Irvin* v. *Dowd*, 366 U. S. 717 (1961). The Constitution prohibits racially biased prosecutorial arguments. *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 643 (1974). If the circumstances of a particular case indicate a significant likelihood that racial bias may influence a jury, the Constitution requires questioning as to such bias. *Ristaino* v. *Ross*, 424 U. S. 589, 596 (1976). Finally, in a capital sentencing hearing, a defendant convicted of an interracial murder is entitled to such questioning without regard to the circumstances of the particular case. *Turner* v. *Murray*, 476 U. S. 28 (1986).

*Louisiana,* 391 U. S. 145, 155 (1968).[31]  Thus, it is the jury that is a criminal defendant's fundamental "protection of life and liberty against race or color prejudice." *Strauder* v. *West Virginia,* 100 U. S. 303, 309 (1880).  Specifically, a capital sentencing jury representative of a criminal defendant's community assures a "'diffused impartiality,'" *Taylor* v. *Louisiana,* 419 U. S. 522, 530 (1975) (quoting *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 227 (1946) (Frankfurter, J., dissenting)), in the jury's task of "express[ing] the conscience of the community on the ultimate question of life or death," *Witherspoon* v. *Illinois,* 391 U. S. 510, 519 (1968).[32]

---

[31] In advocating the adoption of the Constitution, Alexander Hamilton stated:

"The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them, it consists in this: the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government."  The Federalist No. 83, p. 519 (J. Gideon ed. 1818).

[32] In *Witherspoon,* JUSTICE BRENNAN joined the opinion of the Court written by Justice Stewart.  The Court invalidated a statute that permitted a prosecutor to eliminate prospective jurors by challenging all who expressed qualms about the death penalty.  The Court expressly recognized that the purpose of the "broad discretion" given to a sentencing jury is "to decide whether or not death is 'the proper penalty' in a given case," noting that "a juror's general views about capital punishment play an inevitable role in any such decision."  391 U. S., at 519 (emphasis omitted).  Thus, a sentencing jury must be composed of persons capable of expressing the "conscience of the community on the ultimate question of life or death." *Ibid.*  The Court referred specifically to the plurality opinion of Chief Justice Warren in *Trop* v. *Dulles,* 356 U. S. 86 (1958), to the effect that it is the jury that must "maintain a link between contemporary community values and the penal system . . . ."  391 U. S., at 519, n. 15.

JUSTICE BRENNAN's condemnation of the results of the Georgia capital punishment system must be viewed against this background.  As to community values and the constitutionality of capital punishment in general, we have previously noted, n. 23, *supra,* that the elected representatives of the people in 37 States and the Congress have enacted capital punishment statutes, most of which have been enacted or amended to conform generally to the *Gregg* standards, and that 33 States have imposed death sen-

Individual jurors bring to their deliberations "qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters* v. *Kiff*, 407 U. S. 493, 503 (1972) (opinion of MARSHALL, J.). The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that "buil[d] discretion, equity, and flexibility into a legal system." H. Kalven & H. Zeisel, The American Jury 498 (1966).

McCleskey's argument that the Constitution condemns the discretion allowed decisionmakers in the Georgia capital sentencing system is antithetical to the fundamental role of discretion in our criminal justice system. Discretion in the criminal justice system offers substantial benefits to the criminal defendant. Not only can a jury decline to impose the death sentence, it can decline to convict or choose to convict of a lesser offense. Whereas decisions against a defendant's interest may be reversed by the trial judge or on appeal, these discretionary exercises of leniency are final and unreviewable.[33] Similarly, the capacity of prosecutorial dis-

---

tences thereunder. In the individual case, a jury sentence reflects the conscience of the community as applied to the circumstances of a particular offender and offense. We reject JUSTICE BRENNAN's contention that this important standard for assessing the constitutionality of a death penalty should be abandoned.

[33] In the guilt phase of a trial, the Double Jeopardy Clause bars reprosecution after an acquittal, even if the acquittal is " 'based upon an egregiously erroneous foundation.' " *United States* v. *DiFrancesco*, 449 U. S. 117, 129 (1980) (quoting *Fong Foo* v. *United States*, 369 U. S. 141, 143 (1962)). See Powell, Jury Trial of Crimes, 23 Wash. & Lee L. Rev. 1, 7–8 (1966) (Despite the apparent injustice of such an acquittal, "[t]he founding

cretion to provide individualized justice is "firmly entrenched in American law." 2 W. LaFave & J. Israel, Criminal Procedure § 13.2(a), p. 160 (1984). As we have noted, a prosecutor can decline to charge, offer a plea bargain,[34] or decline to seek a death sentence in any particular case. See n. 28, *supra*. Of course, "the power to be lenient [also] is the power to discriminate," K. Davis, Discretionary Justice 170 (1973), but a capital punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice." *Gregg* v. *Georgia*, 428 U. S., at 200, n. 50.

## C

At most, the Baldus study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system.[35]

---

fathers, in light of history, decided that the balance here should be struck in favor of the individual").

In the penalty hearing, Georgia law provides that "unless the jury . . . recommends the death sentence in its verdict, the court shall not sentence the defendant to death." Georgia Code Ann. § 17–10–31 (1982). In *Bullington* v. *Missouri*, 451 U. S. 430 (1981), this Court held that the Double Jeopardy Clause of the Constitution prohibits a State from asking for a sentence of death at a second trial when the jury at the first trial recommended a lesser sentence.

[34] In this case, for example, McCleskey declined to enter a guilty plea. According to his trial attorney: "[T]he Prosecutor was indicating that we might be able to work out a life sentence if he were willing to enter a plea. But we never reached any concrete stage on that because Mr. McCleskey's attitude was that he didn't want to enter a plea. So it never got any further than just talking about it." Tr. in No. 4909, p. 56 (Jan. 30, 1981).

[35] Congress has acknowledged the existence of such discrepancies in criminal sentences, and in 1984 created the United States Sentencing Commission to develop sentencing guidelines. The objective of the guidelines "is to avoid *unwarranted* sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct, while maintaining sufficient flexibility to permit individualized sentencing when warranted by mitigating or aggravating factors not taken into account in the guidelines." 52 Fed. Reg. 3920 (1987) (emphasis added). No one contends that all sentencing disparities can be eliminated. The

The discrepancy indicated by the Baldus study is "a far cry from the major systemic defects identified in *Furman*," *Pulley* v. *Harris*, 465 U. S., at 54.[36] As this Court has recognized, any mode for determining guilt or punishment "has its weaknesses and the potential for misuse." *Singer* v. *United States*, 380 U. S. 24, 35 (1965). See *Bordenkircher* v. *Hayes*, 434 U. S. 357, 365 (1978). Specifically, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant* v. *Stephens*, 462 U. S. 862, 884 (1983) (quoting *Lockett* v. *Ohio*, 438 U. S., at 605 (plurality opinion of Burger, C. J.)). Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." *Singer* v. *United States*, *supra*, at 35. Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.[37]

---

guidelines, like the safeguards in the *Gregg*-type statute, further an essential need of the Anglo-American criminal justice system—to balance the desirability of a high degree of uniformity against the necessity for the exercise of discretion.

[36] The Baldus study in fact confirms that the Georgia system results in a reasonable level of proportionality among the class of murderers eligible for the death penalty. As Professor Baldus confirmed, the system sorts out cases where the sentence of death is highly likely and highly unlikely, leaving a midrange of cases where the imposition of the death penalty in any particular case is less predictable. App. 35–36. See n. 5, *supra*.

[37] JUSTICE BRENNAN's eloquent dissent of course reflects his often repeated opposition to the death sentence. His views, that also are shared by JUSTICE MARSHALL, are principled and entitled to respect. Neverthe-

## V

Two additional concerns inform our decision in this case. First, McCleskey's claim, taken to its logical conclusion,

less, since *Gregg* was decided in 1976, seven Members of this Court consistently have upheld sentences of death under *Gregg*-type statutes providing for meticulous review of each sentence in both state and federal courts. The ultimate thrust of JUSTICE BRENNAN's dissent is that *Gregg* and its progeny should be overruled. He does not, however, expressly call for the overruling of any prior decision. Rather, relying on the Baldus study, JUSTICE BRENNAN, joined by JUSTICES MARSHALL, BLACKMUN, and STEVENS, questions the very heart of our criminal justice system: the traditional discretion that prosecutors and juries necessarily must have.

We have held that discretion in a capital punishment system is necessary to satisfy the Constitution. *Woodson* v. *North Carolina*, 428 U. S. 280 (1976). See *supra*, at 303–306. Yet, the dissent now claims that the "discretion afforded prosecutors and jurors in the Georgia capital sentencing system" violates the Constitution by creating "opportunities for racial considerations to influence criminal proceedings." *Post*, at 333. The dissent contends that in Georgia "[n]o guidelines govern prosecutorial decisions . . . and [that] Georgia provides juries with no list of aggravating and mitigating factors, nor any standard for balancing them against one another." *Ibid.* Prosecutorial decisions necessarily involve both judgmental and factual decisions that vary from case to case. See ABA Standards for Criminal Justice 3–3.8, 3–3.9 (2d ed. 1982). Thus, it is difficult to imagine guidelines that would produce the predictability sought by the dissent without sacrificing the discretion essential to a humane and fair system of criminal justice. Indeed, the dissent suggests no such guidelines for prosecutorial discretion.

The reference to the failure to provide juries with the list of aggravating and mitigating factors is curious. The aggravating circumstances are set forth in detail in the Georgia statute. See n. 3, *supra*. The jury is not provided with a list of aggravating circumstances because not all of them are relevant to any particular crime. Instead, the prosecutor must choose the relevant circumstances and the State must prove to the jury that at least one exists beyond a reasonable doubt before the jury can even consider imposing the death sentence. It would be improper and often prejudicial to allow jurors to speculate as to aggravating circumstances wholly without support in the evidence.

The dissent's argument that a list of mitigating factors is required is particularly anomalous. We have held that the Constitution requires that juries be allowed to consider "any relevant mitigating factor," even if it is not

throws into serious question the principles that underlie our entire criminal justice system. The Eighth Amendment is not limited in application to capital punishment, but applies to all penalties. *Solem* v. *Helm,* 463 U. S. 277, 289–290 (1983); see *Rummel* v. *Estelle,* 445 U. S. 263, 293 (1980) (POWELL, J., dissenting). Thus, if we accepted McCleskey's claim that racial bias has impermissibly tainted the capital sentencing decision, we could soon be faced with similar claims as to other types of penalty.[38] Moreover, the claim that his sen-

---

included in a statutory list. *Eddings* v. *Oklahoma,* 455 U. S., at 112. See *Lockett* v. *Ohio,* 438 U. S. 586 (1978). The dissent does not attempt to harmonize its criticism with this constitutional principle. The dissent also does not suggest any standard, much less a workable one, for balancing aggravating and mitigating factors. If capital defendants are to be treated as "uniquely individual human beings," *Woodson* v. *North Carolina, supra,* at 304, then discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed is essential.

The dissent repeatedly emphasizes the need for "a uniquely high degree of rationality in imposing the death penalty." *Post,* at 335. Again, no suggestion is made as to how greater "rationality" could be achieved under any type of statute that authorizes capital punishment. The *Gregg*-type statute imposes unprecedented safeguards in the special context of capital punishment. These include: (i) a bifurcated sentencing proceeding; (ii) the threshold requirement of one or more aggravating circumstances; and (iii) mandatory State Supreme Court review. All of these are administered pursuant to this Court's decisions interpreting the limits of the Eighth Amendment on the imposition of the death penalty, and all are subject to ultimate review by this Court. These ensure a degree of care in the imposition of the sentence of death that can be described only as unique. Given these safeguards already inherent in the imposition and review of capital sentences, the dissent's call for greater rationality is no less than a claim that a capital punishment system cannot be administered in accord with the Constitution. As we reiterate, *infra,* the requirement of heightened rationality in the imposition of capital punishment does not "plac[e] totally unrealistic conditions on its use." *Gregg* v. *Georgia,* 428 U. S., at 199, n. 50.

[38] Studies already exist that allegedly demonstrate a racial disparity in the length of prison sentences. See, *e. g.,* Spohn, Gruhl, & Welch, The Effect of Race on Sentencing: A Reexamination of an Unsettled Question, 16 Law & Soc. Rev. 71 (1981–1982); Unnever, Frazier, & Henretta, Race Differences in Criminal Sentencing, 21 Sociological Q. 197 (1980).

tence rests on the irrelevant factor of race easily could be extended to apply to claims based on unexplained discrepancies that correlate to membership in other minority groups,[39] and

[39] In *Regents of the University of California* v. *Bakke*, 438 U. S. 265, 295 (1978) (opinion of POWELL, J.), we recognized that the national "majority" "is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals." See *id.*, at 292 (citing *Strauder* v. *West Virginia*, 100 U. S., at 308 (Celtic Irishmen) (dictum); *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886) (Chinese); *Truax* v. *Raich*, 239 U. S. 33, 36, 41–42 (1915) (Austrian resident aliens); *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944) (Japanese); *Hernandez* v. *Texas*, 347 U. S. 475 (1954) (Mexican-Americans)). See also Uniform Guidelines on Employee Selection Procedures (1978), 29 CFR § 1607.4(B) (1986) (employer must keep records as to the "following races and ethnic groups: Blacks, American Indians (including Alaskan Natives), Asians (including Pacific Islanders), Hispanics (including persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish origin or culture regardless of race), and whites (Caucasians) other than Hispanics"); U. S. Bureau of the Census, 1980 Census of the Population, Vol. 1, ch. B (PC80–1–B), reprinted in 1986 Statistical Abstract of the United States 29 (dividing United States population by "race and Spanish origin" into the following groups: White, Black, American Indian, Chinese, Filipino, Japanese, Korean, Vietnamese, Spanish origin, and all other races); U. S. Bureau of the Census, 1980 Census of the Population, Supplementary Report, series PC80–S1–10, reprinted in 1986 Statistical Abstract of the United States 34 (listing 44 ancestry groups and noting that many individuals reported themselves to belong to multiple ancestry groups).

We also have recognized that the ethnic composition of the Nation is ever shifting. *Crawford* v. *Board of Ed. of Los Angeles*, 458 U. S. 527 (1982), illustrates demographic facts that we increasingly find in our country, namely, that populations change in composition, and may do so in relatively short timespans. We noted: "In 1968 when the case went to trial, the [Los Angeles] District was 53.6% white, 22.6% black, 20% Hispanic, and 3.8% Asian and other. By October 1980, the demographic composition had altered radically: 23.7% white, 23.3% black, 45.3% Hispanic, and 7.7% Asian and other." *Id.*, at 530, n. 1. Increasingly whites are becoming a minority in many of the larger American cities. There appears to be no reason why a white defendant in such a city could not make a claim similar to McCleskey's if racial disparities in sentencing arguably are shown by a statistical study.

Finally, in our heterogeneous society the lower courts have found the boundaries of race and ethnicity increasingly difficult to determine. See

even to gender.[40]   Similarly, since McCleskey's claim relates to the race of his victim, other claims could apply with equally logical force to statistical disparities that correlate with the race or sex of other actors in the criminal justice system, such as defense attorneys[41] or judges.[42]   Also, there is no logical reason that such a claim need be limited to racial or sexual bias.   If arbitrary and capricious punishment is the touchstone under the Eighth Amendment, such a claim could—at least in theory—be based upon any arbitrary variable, such as the defendant's facial characteristics,[43] or the physical attractiveness of the defendant or the victim,[44] that some sta-

---

*Shaare Tefila Congregation* v. *Cobb*, 785 F. 2d 523 (CA4), cert. granted, 479 U. S. 812 (1986), and *Al-Khazraji* v. *Saint Francis College*, 784 F. 2d 505 (CA3), cert. granted, 479 U. S. 812 (1986) (argued Feb. 25, 1987) (presenting the questions whether Jews and Arabs, respectively, are "races" covered by 42 U. S. C. §§ 1981 and 1982).

[40] See Chamblin, The Effect of Sex on the Imposition of the Death Penalty (speech given at a symposium of the American Psychological Association, entitled "Extra-legal Attributes Affecting Death Penalty Sentencing," New York City, Sept., 1979); Steffensmeier, Effects of Judge's and Defendant's Sex on the Sentencing of Offenders, 14 Psychology, Journal of Human Behavior, 3 (Aug. 1977).

[41] See Johnson, Black Innocence and the White Jury, 83 Mich. L. Rev. 1611, 1625–1640, and n. 115 (1985) (citing Cohen & Peterson, Bias in the Courtroom: Race and Sex Effects of Attorneys on Juror Verdicts, 9 Social Behavior & Personality 81 (1981)); Hodgson & Pryor, Sex Discrimination in the Courtroom: Attorney's Gender and Credibility, 55 Psychological Rep. 483 (1984).

[42] See Steffensmeier, *supra*, at 7.

[43] See Kerr, Bull, MacCoun, & Rathborn, Effects of victim attractiveness, care and disfigurement on the judgements of American and British mock jurors, 24 Brit. J. Social Psych. 47 (1985); Johnson, *supra*, at 1638, n. 128 (citing Shoemaker, South, & Lowe, Facial Stereotypes of Deviants and Judgments of Guilt or Innocence, 51 Social Forces 427 (1973)).

[44] Some studies indicate that physically attractive defendants receive greater leniency in sentencing than unattractive defendants, and that offenders whose victims are physically attractive receive harsher sentences than defendants with less attractive victims.   Smith & Hed, Effects of Offenders' Age and Attractiveness on Sentencing by Mock Juries, 44 Psy-

tistical study indicates may be influential in jury decision-making. As these examples illustrate, there is no limiting principle to the type of challenge brought by McCleskey.[45]

chological Rep. 691 (1979); Kerr, Beautiful and Blameless: Effects of Victim Attractiveness and Responsibility on Mock Jurors' Verdicts, 4 Personality and Social Psych. Bull. 479 (1978). But see Baumeister & Darley, Reducing the Biasing Effect of Perpetrator Attractiveness in Jury Simulation, 8 Personality and Social Psych. Bull. 286 (1982); Schwibbe & Schwibbe, Judgment and Treatment of People of Varied Attractiveness, 48 Psychological Rep. 11 (1981); Weiten, The Attraction-Leniency Effect in Jury Research: An Examination of External Validity, 10 J. Applied Social Psych. 340 (1980).

[45] JUSTICE STEVENS, who would not overrule *Gregg*, suggests in his dissent that the infirmities alleged by McCleskey could be remedied by narrowing the class of death-eligible defendants to categories identified by the Baldus study where "prosecutors consistently seek, and juries consistently impose, the death penalty without regard to the race of the victim or the race of the offender." *Post*, at 367. This proposed solution is unconvincing. First, "consistently" is a relative term, and narrowing the category of death-eligible defendants would simply shift the borderline between those defendants who received the death penalty and those who did not. A borderline area would continue to exist and vary in its boundaries. Moreover, because the discrepancy between borderline cases would be difficult to explain, the system would likely remain open to challenge on the basis that the lack of explanation rendered the sentencing decisions unconstitutionally arbitrary.

Second, even assuming that a category with theoretically consistent results could be identified, it is difficult to imagine how JUSTICE STEVENS' proposal would or could operate on a case-by-case basis. Whenever a victim is white and the defendant is a member of a different race, what steps would a prosecutor be required to take—in addition to weighing the customary prosecutorial considerations—before concluding in the particular case that he lawfully could prosecute? In the absence of a current, Baldus-type study focused particularly on the community in which the crime was committed, where would he find a standard? Would the prosecutor have to review the prior decisions of community prosecutors and determine the types of cases in which juries in his jurisdiction "consistently" had imposed the death penalty when the victim was white and the defendant was of a different race? And must he rely solely on statistics? Even if such a study were feasible, would it be unlawful for the prosecutor, in making his

The Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment. As we have stated specifically in the context of capital punishment, the Constitution does not "plac[e] totally unrealistic conditions on its use." *Gregg* v. *Georgia*, 428 U. S., at 199, n. 50.

Second, McCleskey's arguments are best presented to the legislative bodies. It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes. It is the legislatures, the elected representatives of the people, that are "constituted to respond to the will and consequently the moral values of the people." *Furman* v. *Georgia*, 408 U. S., at 383 (Burger, C. J., dissenting). Legislatures also are better qualified to weigh and "evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts," *Gregg* v. *Georgia*, *supra*, at 186. Capital punishment is now the law in more than two-thirds of our States. It is the ultimate duty of courts to determine on a case-by-case basis whether these laws are applied consistently with the Constitution. Despite McCleskey's wide-ranging arguments that basically challenge the validity of capital punishment in our multiracial society, the only question before us is whether in his case, see *supra*, at 283–285, the law of Georgia was properly applied. We agree with the District Court and the Court of Appeals for the Eleventh Circuit that this was carefully and correctly done in this case.

---

final decision in a particular case, to consider the evidence of guilt and the presence of aggravating and mitigating factors? However conscientiously a prosecutor might attempt to identify death-eligible defendants under the dissent's suggestion, it would be a wholly speculative task at best, likely to result in less rather than more fairness and consistency in the imposition of the death penalty.

## VI

Accordingly, we affirm the judgment of the Court of Appeals for the Eleventh Circuit.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE BLACKMUN and JUSTICE STEVENS join in all but Part I, dissenting.

## I

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, I would vacate the decision below insofar as it left undisturbed the death sentence imposed in this case. *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting). The Court observes that "[t]he *Gregg*-type statute imposes unprecedented safeguards in the special context of capital punishment," which "ensure a degree of care in the imposition of the death penalty that can be described only as unique." *Ante,* at 315, n. 37. Notwithstanding these efforts, murder defendants in Georgia with white victims are more than four times as likely to receive the death sentence as are defendants with black victims. Petitioner's Exhibit DB 82. Nothing could convey more powerfully the intractable reality of the death penalty: "that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether." *Godfrey* v. *Georgia,* 446 U. S. 420, 442 (1980) (MARSHALL, J., concurring in judgment).

Even if I did not hold this position, however, I would reverse the Court of Appeals, for petitioner McCleskey has clearly demonstrated that his death sentence was imposed in violation of the Eighth and Fourteenth Amendments. While I join Parts I through IV-A of JUSTICE BLACKMUN's dissenting opinion discussing petitioner's Fourteenth Amendment claim, I write separately to emphasize how conclusively

McCleskey has also demonstrated precisely the type of risk of irrationality in sentencing that we have consistently condemned in our Eighth Amendment jurisprudence.

## II

At some point in this case, Warren McCleskey doubtless asked his lawyer whether a jury was likely to sentence him to die.   A candid reply to this question would have been disturbing.   First, counsel would have to tell McCleskey that few of the details of the crime or of McCleskey's past criminal conduct were more important than the fact that his victim was white.   Petitioner's Supplemental Exhibits (Supp. Exh.) 50.   Furthermore, counsel would feel bound to tell McCleskey that defendants charged with killing white victims in Georgia are 4.3 times as likely to be sentenced to death as defendants charged with killing blacks.   Petitioner's Exhibit DB 82.   In addition, frankness would compel the disclosure that it was more likely than not that the race of McCleskey's victim would determine whether he received a death sentence: 6 of every 11 defendants convicted of killing a white person would not have received the death penalty if their victims had been black, Supp. Exh. 51, while, among defendants with aggravating and mitigating factors comparable to McCleskey's, 20 of every 34 would not have been sentenced to die if their victims had been black.   *Id.*, at 54. Finally, the assessment would not be complete without the information that cases involving black defendants and white victims are more likely to result in a death sentence than cases featuring any other racial combination of defendant and victim.   *Ibid.*   The story could be told in a variety of ways, but McCleskey could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

The Court today holds that Warren McCleskey's sentence was constitutionally imposed.   It finds no fault in a system in which lawyers must tell their clients that race casts a

large shadow on the capital sentencing process. The Court arrives at this conclusion by stating that the Baldus study cannot *"prove* that race enters into any capital sentencing decisions or that race was a factor in McCleskey's particular case." *Ante,* at 308 (emphasis in original). Since, according to Professor Baldus, we cannot say "to a moral certainty" that race influenced a decision, *ante,* at 308, n. 29, we can identify only "a likelihood that a particular factor entered into some decisions," *ante,* at 308, and "a discrepancy that appears to correlate with race." *Ante,* at 312. This "likelihood" and "discrepancy," holds the Court, is insufficient to establish a constitutional violation. The Court reaches this conclusion by placing four factors on the scales opposite McCleskey's evidence: the desire to encourage sentencing discretion, the existence of "statutory safeguards" in the Georgia scheme, the fear of encouraging widespread challenges to other sentencing decisions, and the limits of the judicial role. The Court's evaluation of the significance of petitioner's evidence is fundamentally at odds with our consistent concern for rationality in capital sentencing, and the considerations that the majority invokes to discount that evidence cannot justify ignoring its force.

## III

### A

It is important to emphasize at the outset that the Court's observation that McCleskey cannot prove the influence of race on any particular sentencing decision is irrelevant in evaluating his Eighth Amendment claim. Since *Furman* v. *Georgia,* 408 U. S. 238 (1972), the Court has been concerned with the *risk* of the imposition of an arbitrary sentence, rather than the proven fact of one. *Furman* held that the death penalty "may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey* v. *Georgia, supra,* at 427. As JUSTICE O'CONNOR observed

in *Caldwell* v. *Mississippi*, 472 U. S. 320, 343 (1985), a death sentence must be struck down when the circumstances under which it has been imposed "creat[e] an unacceptable *risk* that 'the death penalty [may have been] meted out arbitrarily or capriciously' or through 'whim or mistake'" (emphasis added) (quoting *California* v. *Ramos*, 463 U. S. 992, 999 (1983)). This emphasis on risk acknowledges the difficulty of divining the jury's motivation in an individual case. In addition, it reflects the fact that concern for arbitrariness focuses on the rationality of the system as a whole, and that a system that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational.[1]  As we said in *Gregg* v. *Georgia*, 428 U. S., at 200, "the petitioner looks to the sentencing system as a whole (as the Court did in *Furman* and we do today)": a constitutional violation is established if a plaintiff demonstrates a *"pattern* of arbitrary and capricious sentencing." *Id.*, at 195, n. 46 (emphasis added) (joint opinion of Stewart, POWELL, and STEVENS, JJ.).

As a result, our inquiry under the Eighth Amendment has not been directed to the validity of the individual sentences before us. In *Godfrey*, for instance, the Court struck down the petitioner's sentence because the vagueness of the statutory definition of heinous crimes created a *risk* that prejudice

---

[1] Once we can identify a pattern of arbitrary sentencing outcomes, we can say that a defendant runs a risk of being sentenced arbitrarily. It is thus immaterial whether the operation of an impermissible influence such as race is intentional. While the Equal Protection Clause forbids racial discrimination, and intent may be critical in a successful claim under that provision, the Eighth Amendment has its own distinct focus: whether punishment comports with social standards of rationality and decency. It may be, as in this case, that on occasion an influence that makes punishment arbitrary is also proscribed under another constitutional provision. That does not mean, however, that the standard for determining an Eighth Amendment violation is superseded by the standard for determining a violation under this other provision. Thus, the fact that McCleskey presents a viable equal protection claim does not require that he demonstrate intentional racial discrimination to establish his Eighth Amendment claim.

or other impermissible influences *might have infected* the sentencing decision. In vacating the sentence, we did not ask whether it was likely that Godfrey's own sentence reflected the operation of irrational considerations. Nor did we demand a demonstration that such considerations had actually entered into other sentencing decisions involving heinous crimes. Similarly, in *Roberts* v. *Louisiana*, 428 U. S. 325 (1976), and *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), we struck down death sentences in part because mandatory imposition of the death penalty created the *risk* that a jury *might* rely on arbitrary considerations in deciding which persons should be convicted of capital crimes. Such a risk would arise, we said, because of the likelihood that jurors reluctant to impose capital punishment on a particular defendant would refuse to return a conviction, so that the effect of mandatory sentencing would be to recreate the unbounded sentencing discretion condemned in *Furman*. *Roberts, supra*, at 334–335 (plurality opinion); *Woodson, supra*, at 303 (plurality opinion). We did not ask whether the death sentences in the cases before us could have reflected the jury's rational consideration and rejection of mitigating factors. Nor did we require proof that juries had actually acted irrationally in other cases.

Defendants challenging their death sentences thus never have had to prove that impermissible considerations have actually infected sentencing decisions. We have required instead that they establish that the system under which they were sentenced posed a significant risk of such an occurrence. McCleskey's claim does differ, however, in one respect from these earlier cases: it is the first to base a challenge not on speculation about how a system *might* operate, but on empirical documentation of how it *does* operate.

The Court assumes the statistical validity of the Baldus study, and acknowledges that McCleskey has demonstrated a risk that racial prejudice plays a role in capital sentencing in Georgia, *ante*, at 291, n. 7. Nonetheless, it finds the probability of prejudice insufficient to create constitutional con-

cern. *Ante*, at 313. Close analysis of the Baldus study, however, in light of both statistical principles and human experience, reveals that the risk that race influenced Mc-Cleskey's sentence is intolerable by any imaginable standard.

## B

The Baldus study indicates that, after taking into account some 230 nonracial factors that might legitimately influence a sentencer, the jury *more likely than not* would have spared McCleskey's life had his victim been black. The study distinguishes between those cases in which (1) the jury exercises virtually no discretion because the strength or weakness of aggravating factors usually suggests that only one outcome is appropriate;[2] and (2) cases reflecting an "intermediate" level of aggravation, in which the jury has considerable discretion in choosing a sentence.[3] McCleskey's case falls into the intermediate range. In such cases, death is imposed in 34% of white-victim crimes and 14% of black-victim crimes, a difference of 139% in the rate of imposition of the death penalty. Supp. Exh. 54. In other words, just under 59%—almost 6 in 10—defendants comparable to McCleskey would not have received the death penalty if their victims had been black.[4]

---

[2] The first two and the last of the study's eight case categories represent those cases in which the jury typically sees little leeway in deciding on a sentence. Cases in the first two categories are those that feature aggravating factors so minimal that juries imposed no death sentences in the 88 cases with these factors during the period of the study. Supp. Exh. 54. Cases in the eighth category feature aggravating factors so extreme that the jury imposed the death penalty in 88% of the 58 cases with these factors in the same period. *Ibid.*

[3] In the five categories characterized as intermediate, the rate at which the death penalty was imposed ranged from 8% to 41%. The overall rate for the 326 cases in these categories was 20%. *Ibid.*

[4] The considerable racial disparity in sentencing rates among these cases is consistent with the "liberation hypothesis" of H. Kalven and H. Zeisel in their landmark work, The American Jury (1966). These authors found

Furthermore, even examination of the sentencing system as a whole, factoring in those cases in which the jury exercises little discretion, indicates the influence of race on capital sentencing. For the Georgia system as a whole, race accounts for a six percentage point difference in the rate at which capital punishment is imposed. Since death is imposed in 11% of all white-victim cases, the rate in comparably aggravated black-victim cases is 5%. The rate of capital sentencing in a white-victim case is thus 120% greater than the rate in a black-victim case. Put another way, over half—55%—of defendants in white-victim crimes in Georgia would not have been sentenced to die if their victims had been black. Of the more than 200 variables potentially relevant to a sentencing decision, race of the victim is a powerful explanation for variation in death sentence rates—as powerful as nonracial aggravating factors such as a prior murder conviction or acting as the principal planner of the homicide.[5]

These adjusted figures are only the most conservative indication of the risk that race will influence the death sentences of defendants in Georgia. Data unadjusted for the mitigating or aggravating effect of other factors show an even more pronounced disparity by race. The capital sentencing rate for all white-victim cases was almost *11 times* greater than

that, in close cases in which jurors were most often in disagreement, "[t]he closeness of the evidence makes it possible for the jury to respond to sentiment by *liberating it* from the discipline of the evidence." *Id.*, at 165. While "the jury does not often consciously and explicitly yield to sentiment in the teeth of the law . . . it yields to sentiment in the apparent process of resolving doubts as to evidence. The jury, therefore, is able to conduct its revolt from the law within the etiquette of resolving issues of fact." *Ibid.* Thus, it is those cases in which sentencing evidence seems to dictate neither life imprisonment nor the death penalty that impermissible factors such as race play the most prominent role.

[5] The fact that a victim was white accounts for a nine percentage point difference in the rate at which the death penalty is imposed, which is the same difference attributable to a prior murder conviction or the fact that the defendant was the "prime mover" in planning a murder. Supp. Exh. 50.

the rate for black-victim cases. Supp. Exh. 47. Furthermore, blacks who kill whites are sentenced to death at nearly *22 times* the rate of blacks who kill blacks, and more than *7 times* the rate of whites who kill blacks. *Ibid.* In addition, prosecutors seek the death penalty for 70% of black defendants with white victims, but for only 15% of black defendants with black victims, and only 19% of white defendants with black victims. *Id.*, at 56. Since our decision upholding the Georgia capital sentencing system in *Gregg*, the State has executed seven persons. All of the seven were convicted of killing whites, and six of the seven executed were black.[6] Such execution figures are especially striking in light of the fact that, during the period encompassed by the Baldus study, only 9.2% of Georgia homicides involved black defendants and white victims, while 60.7% involved black victims.

McCleskey's statistics have particular force because most of them are the product of sophisticated multiple-regression analysis. Such analysis is designed precisely to identify patterns in the aggregate, even though we may not be able to reconstitute with certainty any individual decision that goes to make up that pattern. Multiple-regression analysis is particularly well suited to identify the influence of impermissible considerations in sentencing, since it is able to control for permissible factors that may explain an apparent arbitrary pattern.[7] While the decisionmaking process of a body such as a jury may be complex, the Baldus study provides a massive compilation of the details that are most relevant to that decision. As we held in the context of Title VII of the Civil Rights Act of 1964 last Term in *Bazemore* v. *Friday*, 478 U. S. 385 (1986), a multiple-regression analysis need not include every conceivable variable to establish a party's case, as long as it includes those variables that account for the

---

[6] NAACP Legal Defense and Educational Fund, Death Row, U. S. A. 4 (Aug. 1, 1986).

[7] See generally Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 701 (1980).

major factors that are likely to influence decisions. In this case, Professor Baldus in fact conducted additional regression analyses in response to criticisms and suggestions by the District Court, all of which confirmed, and some of which even strengthened, the study's original conclusions.

The statistical evidence in this case thus relentlessly documents the risk that McCleskey's sentence was influenced by racial considerations. This evidence shows that there is a better than even chance in Georgia that race will influence the decision to impose the death penalty: a majority of defendants in white-victim crimes would not have been sentenced to die if their victims had been black. In determining whether this risk is acceptable, our judgment must be shaped by the awareness that "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence," *Turner* v. *Murray*, 476 U. S. 28, 35 (1986), and that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," *Gardner* v. *Florida*, 430 U. S. 349, 358 (1977). In determining the guilt of a defendant, a State must prove its case beyond a reasonable doubt. That is, we refuse to convict if the chance of error is simply less likely than not. Surely, we should not be willing to take a person's life if the chance that his death sentence was irrationally imposed is *more* likely than not. In light of the gravity of the interest at stake, petitioner's statistics on their face are a powerful demonstration of the type of risk that our Eighth Amendment jurisprudence has consistently condemned.

## C

Evaluation of McCleskey's evidence cannot rest solely on the numbers themselves. We must also ask whether the conclusion suggested by those numbers is consonant with our understanding of history and human experience. Georgia's legacy of a race-conscious criminal justice system, as well as

this Court's own recognition of the persistent danger that racial attitudes may affect criminal proceedings, indicates that McCleskey's claim is not a fanciful product of mere statistical artifice.

For many years, Georgia operated openly and formally precisely the type of dual system the evidence shows is still effectively in place. The criminal law expressly differentiated between crimes committed by and against blacks and whites, distinctions whose lineage traced back to the time of slavery. During the colonial period, black slaves who killed whites in Georgia, regardless of whether in self-defense or in defense of another, were automatically executed. A. Higginbotham, In the Matter of Color: Race in the American Legal Process 256 (1978).[8]

By the time of the Civil War, a dual system of crime and punishment was well established in Georgia. See Ga. Penal Code (1861). The state criminal code contained separate sections for "Slaves and Free Persons of Color," Pt. 4, Tit. 3, Ch. 1, and for all other persons, Pt. 4, Tit. 1, Divs. 1–16. The code provided, for instance, for an automatic death sentence for murder committed by blacks, Pt. 4, Tit. 1, Art. II, § 4704, but declared that anyone else convicted of murder might receive life imprisonment if the conviction were founded solely on circumstantial testimony *or* simply if the jury so recommended. Pt. 4, Tit. 1, Div. 4, § 4220. The code established that the rape of a free white female by a black "shall be" punishable by death. § 4704. However, rape by anyone else of a free white female was punishable by

---

[8] Death could also be inflicted upon a slave who "grievously wound[ed], maim[ed], or bruis[ed] any white person," who was convicted for the third time of striking a white person, or who attempted to run away out of the province. A. Higginbotham, In the Matter of Color: Race in the American Legal Process 256 (1978). On the other hand, a person who willfully murdered a slave was not punished until the second offense, and then was responsible simply for restitution to the slave owner. Furthermore, conviction for willful murder of a slave was subject to the difficult requirement of the oath of two white witnesses. *Id.*, at 253–254, and n. 190.

a prison term not less than 2 nor more than 20 years. The rape of *blacks* was punishable "by fine and imprisonment, at the discretion of the court." § 4249. A black convicted of assaulting a free white person with intent to murder could be put to death at the discretion of the court, § 4708, but the same offense committed against a black, slave or free, was classified as a "minor" offense whose punishment lay in the discretion of the court, as long as such punishment did not "extend to life, limb, or health." Art. III, §§ 4714, 4718. Assault with intent to murder by a white person was punishable by a prison term of from 2 to 10 years. Div. 4, § 4258. While sufficient provocation could reduce a charge of murder to manslaughter, the code provided that "[o]bedience and submission being the duty of a slave, much greater provocation is necessary to reduce a homicide of a white person by him to voluntary manslaughter, than is prescribed for white persons." Art. II, § 4711.

In more recent times, some 40 years ago, Gunnar Myrdal's epochal study of American race relations produced findings mirroring McCleskey's evidence:

> "As long as only Negroes are concerned and no whites are disturbed, great leniency will be shown in most cases . . . . The sentences for even major crimes are ordinarily reduced when the victim is another Negro.
>
> .      .      .      .      .
>
> "For offenses which involve any actual or potential danger to whites, however, Negroes are punished more severely than whites.
>
> .      .      .      .      .
>
> "On the other hand, it is quite common for a white criminal to be set free if his crime was against a Negro." G. Myrdal, An American Dilemma 551–553 (1944).

This Court has invalidated portions of the Georgia capital sentencing system three times over the past 15 years. The specter of race discrimination was acknowledged by the Court in striking down the Georgia death penalty statute in *Furman*.

Justice Douglas cited studies suggesting imposition of the death penalty in racially discriminatory fashion, and found the standardless statutes before the Court "pregnant with discrimination." 408 U. S., at 257 (concurring opinion). JUSTICE MARSHALL pointed to statistics indicating that "Negroes [have been] executed far more often than whites in proportion to their percentage of the population. Studies indicate that while the higher rate of execution among Negroes is partially due to a higher rate of crime, there is evidence of racial discrimination." *Id.*, at 364 (concurring opinion). Although Justice Stewart declined to conclude that racial discrimination had been plainly proved, he stated that "[m]y concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race." *Id.*, at 310 (concurring opinion). In dissent, Chief Justice Burger acknowledged that statistics "suggest, at least as a historical matter, that Negroes have been sentenced to death with greater frequency than whites in several States, particularly for the crime of interracial rape." *Id.*, at 289, n. 12. Finally, also in dissent, JUSTICE POWELL intimated that an Equal Protection Clause argument would be available for a black "who could demonstrate that members of his race were being singled out for more severe punishment than others charged with the same offense." *Id.*, at 449. He noted that although the Eighth Circuit had rejected a claim of discrimination in *Maxwell* v. *Bishop*, 398 F. 2d 138 (1968), vacated and remanded on other grounds, 398 U. S. 262 (1970), the statistical evidence in that case "tend[ed] to show a pronounced disproportion in the number of Negroes receiving death sentences for rape in parts of Arkansas and elsewhere in the South." 408 U. S., at 449. It is clear that the Court regarded the opportunity for the operation of racial prejudice a particularly troublesome aspect of the unbounded discretion afforded by the Georgia sentencing scheme.

Five years later, the Court struck down the imposition of the death penalty in Georgia for the crime of rape. *Coker* v. *Georgia*, 433 U. S. 584 (1977). Although the Court did not explicitly mention race, the decision had to have been informed by the specific observations on rape by both the Chief Justice and JUSTICE POWELL in *Furman*. Furthermore, evidence submitted to the Court indicated that black men who committed rape, particularly of white women, were considerably more likely to be sentenced to death than white rapists. For instance, by 1977 Georgia had executed 62 men for rape since the Federal Government began compiling statistics in 1930. Of these men, 58 were black and 4 were white. See Brief for Petitioner in *Coker* v. *Georgia*, O. T. 1976, No. 75–5444, p. 56; see also Wolfgang & Riedel, Rape, Race, and the Death Penalty in Georgia, 45 Am. J. Orthopsychiatry 658 (1975).

Three years later, the Court in *Godfrey* found one of the State's statutory aggravating factors unconstitutionally vague, since it resulted in "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury . . . ." 446 U. S., at 429. JUSTICE MARSHALL, concurring in the judgment, noted that "[t]he disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in the imposition of death sentences." *Id.*, at 439 (footnote omitted).

This historical review of Georgia criminal law is not intended as a bill of indictment calling the State to account for past transgressions. Citation of past practices does not justify the automatic condemnation of current ones. But it would be unrealistic to ignore the influence of history in assessing the plausible implications of McCleskey's evidence. "[A]mericans share a historical experience that has resulted in individuals within the culture ubiquitously attaching a significance to race that is irrational and often outside their awareness." Lawrence, The Id, The Ego, and Equal Protection: Reckoning With Unconscious Racism, 39 Stan. L.

Rev. 327 (1987). See generally *id.*, at 328–344 (describing the psychological dynamics of unconscious racial motivation). As we said in *Rose* v. *Mitchell,* 443 U. S. 545, 558–559 (1979):

> "[W]e . . . cannot deny that, 114 years after the close of the War Between the States and nearly 100 years after *Strauder,* racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole. Perhaps today that discrimination takes a form more subtle than before. But it is not less real or pernicious."

The ongoing influence of history is acknowledged, as the majority observes, by our "'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *Ante,* at 309 (quoting *Batson* v. *Kentucky,* 476 U. S. 79, 85 (1986)). These efforts, however, signify not the elimination of the problem but its persistence. Our cases reflect a realization of the myriad of opportunities for racial considerations to influence criminal proceedings: in the exercise of peremptory challenges, *Batson* v. *Kentucky, supra;* in the selection of the grand jury, *Vasquez* v. *Hillery,* 474 U. S. 254 (1986); in the selection of the petit jury, *Whitus* v. *Georgia,* 385 U. S. 545 (1967); in the exercise of prosecutorial discretion, *Wayte* v. *United States,* 470 U. S. 598 (1985); in the conduct of argument, *Donnelly* v. *DeChristoforo,* 416 U. S. 637 (1974); and in the conscious or unconscious bias of jurors, *Turner* v. *Murray,* 476 U. S. 28 (1986), *Ristaino* v. *Ross,* 424 U. S. 589 (1976).

The discretion afforded prosecutors and jurors in the Georgia capital sentencing system creates such opportunities. No guidelines govern prosecutorial decisions to seek the death penalty, and Georgia provides juries with no list of aggravating and mitigating factors, nor any standard for balancing them against one another. Once a jury identifies one aggravating factor, it has complete discretion in choosing life or death, and need not articulate its basis for selecting life imprisonment. The Georgia sentencing system there-

fore provides considerable opportunity for racial considerations, however subtle and unconscious, to influence charging and sentencing decisions.[9]

History and its continuing legacy thus buttress the probative force of McCleskey's statistics. Formal dual criminal laws may no longer be in effect, and intentional discrimination may no longer be prominent. Nonetheless, as we acknowledged in *Turner*, "subtle, less consciously held racial attitudes" continue to be of concern, 476 U. S., at 35, and the Georgia system gives such attitudes considerable room to operate. The conclusions drawn from McCleskey's statistical evidence are therefore consistent with the lessons of social experience.

---

[9] The Court contends that it is inappropriate to take into account the wide latitude afforded actors in the Georgia capital sentencing system, since "[w]e have held that discretion in a capital punishment system is necessary to satisfy the Constitution," *ante*, at 314, n. 37, and "no suggestion is made as to how greater 'rationality' could be achieved under any type of statute that authorizes capital punishment." *Ibid*. The first point is true, but of course the Court struck down the death penalty in *Furman* v. *Georgia*, 408 U. S. 238 (1972), because the sentencing systems before it provided *too much* discretion. Since *Gregg* v. *Georgia*, 428 U. S. 153 (1976), the Court's death penalty jurisprudence has rested on the premise that it is possible to establish a system of *guided discretion* that will both permit individualized moral evaluation and prevent impermissible considerations from being taken into account. As JUSTICE BLACKMUN has persuasively demonstrated, *post*, at 357–358, Georgia provides *no* systematic guidelines for prosecutors to utilize in determining for which defendants the death penalty should be sought. Furthermore, whether a State has chosen an effective combination of guidance and discretion in its capital sentencing system as a whole cannot be established in the abstract, as the Court insists on doing, but must be determined empirically, as the Baldus study has done.

With respect to the Court's criticism that McCleskey has not shown how Georgia could do a better job, *ante*, at 315, n. 37, once it is established that the particular system of guided discretion chosen by a State is not achieving its intended purpose, the burden is on the *State*, not the defendant, to devise a more rational system if it wishes to continue to impose the death penalty.

The majority thus misreads our Eighth Amendment jurisprudence in concluding that McCleskey has not demonstrated a degree of risk sufficient to raise constitutional concern. The determination of the significance of his evidence is at its core an exercise in human moral judgment, not a mechanical statistical analysis. It must first and foremost be informed by awareness of the fact that death is irrevocable, and that as a result "the qualitative difference of death from all other punishments requires a greater degree of scrutiny of the capital sentencing determination." *California* v. *Ramos*, 463 U. S., at 998–999. For this reason, we have demanded a uniquely high degree of rationality in imposing the death penalty. A capital sentencing system in which race more likely than not plays a role does not meet this standard. It is true that every nuance of decision cannot be statistically captured, nor can any individual judgment be plumbed with absolute certainty. Yet the fact that we must always act without the illumination of complete knowledge cannot induce paralysis when we confront what is literally an issue of life and death. Sentencing data, history, and experience all counsel that Georgia has provided insufficient assurance of the heightened rationality we have required in order to take a human life.

## IV

The Court cites four reasons for shrinking from the implications of McCleskey's evidence: the desirability of discretion for actors in the criminal justice system, the existence of statutory safeguards against abuse of that discretion, the potential consequences for broader challenges to criminal sentencing, and an understanding of the contours of the judicial role. While these concerns underscore the need for sober deliberation, they do not justify rejecting evidence as convincing as McCleskey has presented.

The Court maintains that petitioner's claim "is antithetical to the fundamental role of discretion in our criminal justice

system." *Ante*, at 311. It states that "[w]here the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." *Ante*, at 313.

Reliance on race in imposing capital punishment, however, is antithetical to the very rationale for granting sentencing discretion. Discretion is a means, not an end. It is bestowed in order to permit the sentencer to "trea[t] each defendant in a capital case with that degree of respect due the uniqueness of the individual." *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978). The decision to impose the punishment of death must be based on a "particularized consideration of relevant aspects of the character and record of each convicted defendant." *Woodson* v. *North Carolina*, 428 U. S., at 303. Failure to conduct such an individualized moral inquiry "treats all persons convicted of a designated offense not as unique individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Id.*, at 304.

Considering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with this concern that an individual be evaluated as a unique human being. Decisions influenced by race rest in part on a categorical assessment of the worth of human beings according to color, insensitive to whatever qualities the individuals in question may possess. Enhanced willingness to impose the death sentence on black defendants, or diminished willingness to render such a sentence when blacks are victims, reflects a devaluation of the lives of black persons. When confronted with evidence that race more likely than not plays such a role in a capital sentencing system, it is plainly insufficient to say that the importance of discretion demands that the risk be higher before we will act—for in such a case the very end that discretion is designed to serve is being undermined.

Our desire for individualized moral judgments may lead us to accept some inconsistencies in sentencing outcomes. Since such decisions are not reducible to mathematical formulae, we are willing to assume that a certain degree of variation reflects the fact that no two defendants are completely alike. There is thus a presumption that actors in the criminal justice system exercise their discretion in responsible fashion, and we do not automatically infer that sentencing patterns that do not comport with ideal rationality are suspect.

As we made clear in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), however, that presumption is rebuttable. *Batson* dealt with another arena in which considerable discretion traditionally has been afforded, the exercise of peremptory challenges. Those challenges are normally exercised without any indication whatsoever of the grounds for doing so. The rationale for this deference has been a belief that the unique characteristics of particular prospective jurors may raise concern on the part of the prosecution or defense, despite the fact that counsel may not be able to articulate that concern in a manner sufficient to support exclusion for cause. As with sentencing, therefore, peremptory challenges are justified as an occasion for particularized determinations related to specific individuals, and, as with sentencing, we presume that such challenges normally are not made on the basis of a factor such as race. As we said in *Batson*, however, such features do not justify imposing a "crippling burden of proof," *id.*, at 92, in order to rebut that presumption. The Court in this case apparently seeks to do just that. On the basis of the need for individualized decisions, it rejects evidence, drawn from the most sophisticated capital sentencing analysis ever performed, that reveals that race more likely than not infects capital sentencing decisions. The Court's position converts a rebuttable presumption into a virtually conclusive one.

The Court also declines to find McCleskey's evidence sufficient in view of "the safeguards designed to minimize racial bias in the [capital sentencing] process." *Ante*, at 313. *Gregg* v. *Georgia*, 428 U. S., at 226, upheld the Georgia capital sentencing statute against a facial challenge which JUSTICE WHITE described in his concurring opinion as based on "simply an assertion of lack of faith" that the system could operate in a fair manner (opinion concurring in judgment). JUSTICE WHITE observed that the claim that prosecutors might act in an arbitrary fashion was "unsupported by any facts," and that prosecutors must be assumed to exercise their charging duties properly "[a]bsent facts to the contrary." *Id.*, at 225. It is clear that *Gregg* bestowed no permanent approval on the Georgia system. It simply held that the State's statutory safeguards were assumed sufficient to channel discretion without evidence otherwise.

It has now been over 13 years since Georgia adopted the provisions upheld in *Gregg*. Professor Baldus and his colleagues have compiled data on almost 2,500 homicides committed during the period 1973–1979. They have taken into account the influence of 230 nonracial variables, using a multitude of data from the State itself, and have produced striking evidence that the odds of being sentenced to death are significantly greater than average if a defendant is black or his or her victim is white. The challenge to the Georgia system is not speculative or theoretical; it is empirical. As a result, the Court cannot rely on the statutory safeguards in discounting McCleskey's evidence, for it is the very effectiveness of those safeguards that such evidence calls into question. While we may hope that a model of procedural fairness will curb the influence of race on sentencing, "we cannot simply assume that the model works as intended; we must critique its performance in terms of its results." Hubbard, "Reasonable Levels of Arbitrariness" in Death Sentencing Patterns: A Tragic Perspective on Capital Punishment, 18 U. C. D. L. Rev. 1113, 1162 (1985).

The Court next states that its unwillingness to regard petitioner's evidence as sufficient is based in part on the fear that recognition of McCleskey's claim would open the door to widespread challenges to all aspects of criminal sentencing. *Ante*, at 314–315. Taken on its face, such a statement seems to suggest a fear of too much justice. Yet surely the majority would acknowledge that if striking evidence indicated that other minority groups, or women, or even persons with blond hair, were disproportionately sentenced to death, such a state of affairs would be repugnant to deeply rooted conceptions of fairness. The prospect that there may be more widespread abuse than McCleskey documents may be dismaying, but it does not justify complete abdication of our judicial role. The Constitution was framed fundamentally as a bulwark against governmental power, and preventing the arbitrary administration of punishment is a basic ideal of any society that purports to be governed by the rule of law.[10]

In fairness, the Court's fear that McCleskey's claim is an invitation to descend a slippery slope also rests on the realization that any humanly imposed system of penalties will exhibit some imperfection. Yet to reject McCleskey's powerful evidence on this basis is to ignore both the qualitatively different character of the death penalty and the particular repugnance of racial discrimination, considerations which may

---

· [10] As Maitland said of the provision of the Magna Carta regulating the discretionary imposition of fines, "[v]ery likely there was no clause in Magna Carta more grateful to the mass of the people." F. Maitland, Pleas of the Crown For the County of Gloucester xxxiv (1884). In our own country, the point is underscored by Patrick Henry's remarks in support of the adoption of a Bill of Rights:

"Congress, from their general powers, may fully go into business of human legislation. They may legislate, in criminal cases, from treason to the lowest offence—petty larceny. They may define crimes and prescribe punishments. In the definition of crimes, I trust they will be directed by what wise representatives ought to be governed by. But when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives." 3 J. Elliot's Debates on the Constitution 447 (1854).

properly be taken into account in determining whether various punishments are "cruel and unusual." Furthermore, it fails to take account of the unprecedented refinement and strength of the Baldus study.

It hardly needs reiteration that this Court has consistently acknowledged the uniqueness of the punishment of death. "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment." *Woodson*, 428 U. S., at 305. Furthermore, the relative interests of the state and the defendant differ dramatically in the death penalty context. The marginal benefits accruing to the state from obtaining the death penalty rather than life imprisonment are considerably less than the marginal difference to the defendant between death and life in prison. Such a disparity is an additional reason for tolerating scant arbitrariness in capital sentencing. Even those who believe that society can impose the death penalty in a manner sufficiently rational to justify its continuation must acknowledge that the level of rationality that *is* considered satisfactory must be *uniquely* high. As a result, the degree of arbitrariness that may be adequate to render the death penalty "cruel and unusual" punishment may not be adequate to invalidate lesser penalties. What these relative degrees of arbitrariness might be in other cases need not concern us here; the point is that the majority's fear of wholesale invalidation of criminal sentences is unfounded.

The Court also maintains that accepting McCleskey's claim would pose a threat to all sentencing because of the prospect that a correlation might be demonstrated between sentencing outcomes and other personal characteristics. Again, such a view is indifferent to the considerations that enter into a determination whether punishment is "cruel and unusual." Race is a consideration whose influence is expressly constitu-

tionally proscribed. We have expressed a moral commitment, as embodied in our fundamental law, that this specific characteristic should not be the basis for allotting burdens and benefits. Three constitutional amendments, and numerous statutes, have been prompted specifically by the desire to address the effects of racism. "Over the years, this Court has consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967) (quoting *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943)). Furthermore, we have explicitly acknowledged the illegitimacy of race as a consideration in capital sentencing, *Zant* v. *Stephens*, 462 U. S. 862, 885 (1983). That a decision to impose the death penalty could be influenced by *race* is thus a particularly repugnant prospect, and evidence that race may play even a modest role in levying a death sentence should be enough to characterize that sentence as "cruel and unusual."

Certainly, a factor that we would regard as morally irrelevant, such as hair color, at least theoretically could be associated with sentencing results to such an extent that we would regard as arbitrary a system in which that factor played a significant role. As I have said above, however, *supra*, at 328–329, the evaluation of evidence suggesting such a correlation must be informed not merely by statistics, but by history and experience. One could hardly contend that this Nation has on the basis of hair color inflicted upon persons deprivation comparable to that imposed on the basis of race. Recognition of this fact would necessarily influence the evaluation of data suggesting the influence of hair color on sentencing, and would require evidence of statistical correlation even more powerful than that presented by the Baldus study.

Furthermore, the Court's fear of the expansive ramifications of a holding for McCleskey in this case is unfounded because it fails to recognize the uniquely sophisticated nature of the Baldus study. McCleskey presents evidence that is

far and away the most refined data ever assembled on any system of punishment, data not readily replicated through casual effort. Moreover, that evidence depicts not merely arguable tendencies, but striking correlations, all the more powerful because nonracial explanations have been eliminated. Acceptance of petitioner's evidence would therefore establish a remarkably stringent standard of statistical evidence unlikely to be satisfied with any frequency.

The Court's projection of apocalyptic consequences for criminal sentencing is thus greatly exaggerated. The Court can indulge in such speculation only by ignoring its own jurisprudence demanding the highest scrutiny on issues of death and race. As a result, it fails to do justice to a claim in which both those elements are intertwined—an occasion calling for the most sensitive inquiry a court can conduct. Despite its acceptance of the validity of Warren McCleskey's evidence, the Court is willing to let his death sentence stand because it fears that we cannot successfully define a different standard for lesser punishments. This fear is baseless.

Finally, the Court justifies its rejection of McCleskey's claim by cautioning against usurpation of the legislatures' role in devising and monitoring criminal punishment. The Court is, of course, correct to emphasize the gravity of constitutional intervention and the importance that it be sparingly employed. The fact that "[c]apital punishment is now the law in more than two thirds of our States," *ante*, at 319, however, does not diminish the fact that capital punishment is the most awesome act that a State can perform. The judiciary's role in this society counts for little if the use of governmental power to extinguish life does not elicit close scrutiny. It is true that society has a legitimate interest in punishment. Yet, as Alexander Bickel wrote:

> "It is a premise we deduce not merely from the fact of a written constitution but from the history of the race, and ultimately as a moral judgment of the good society, that government should serve not only what we conceive

from time to time to be our immediate material needs but also certain enduring values. This in part is what is meant by government under law." The Least Dangerous Branch 24 (1962).

Our commitment to these values requires fidelity to them even when there is temptation to ignore them. Such temptation is especially apt to arise in criminal matters, for those granted constitutional protection in this context are those whom society finds most menacing and opprobrious. Even less sympathetic are those we consider for the sentence of death, for execution "is a way of saying, 'You are not fit for this world, take your chance elsewhere.'" *Furman*, 408 U. S., at 290 (BRENNAN, J., concurring) (quoting Stephen, Capital Punishments, 69 Fraser's Magazine 753, 763 (1864)).

For these reasons, "[t]he methods we employ in the enforcement of our criminal law have aptly been called the measures by which the quality of our civilization may be judged." *Coppedge* v. *United States*, 369 U. S. 438, 449 (1962). Those whom we would banish from society or from the human community itself often speak in too faint a voice to be heard above society's demand for punishment. It is the particular role of courts to hear these voices, for the Constitution declares that the majoritarian chorus may not alone dictate the conditions of social life. The Court thus fulfills, rather than disrupts, the scheme of separation of powers by closely scrutinizing the imposition of the death penalty, for no decision of a society is more deserving of "sober second thought." Stone, The Common Law in the United States, 50 Harv. L. Rev. 4, 25 (1936).

## V

At the time our Constitution was framed 200 years ago this year, blacks "had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect." *Dred Scott* v. *Sandford*,

19 How. 393, 407 (1857). Only 130 years ago, this Court re-
lied on these observations to deny American citizenship to
blacks. *Ibid.* A mere three generations ago, this Court
sanctioned racial segregation, stating that "[i]f one race be in-
ferior to the other socially, the Constitution of the United
States cannot put them upon the same plane." *Plessy* v.
*Ferguson*, 163 U. S. 537, 552 (1896).

In more recent times, we have sought to free ourselves
from the burden of this history. Yet it has been scarcely a
generation since this Court's first decision striking down ra-
cial segregation, and barely two decades since the legislative
prohibition of racial discrimination in major domains of na-
tional life. These have been honorable steps, but we cannot
pretend that in three decades we have completely escaped
the grip of a historical legacy spanning centuries. Warren
McCleskey's evidence confronts us with the subtle and per-
sistent influence of the past. His message is a disturbing
one to a society that has formally repudiated racism, and a
frustrating one to a Nation accustomed to regarding its des-
tiny as the product of its own will. Nonetheless, we ignore
him at our peril, for we remain imprisoned by the past as long
as we deny its influence in the present.

It is tempting to pretend that minorities on death row
share a fate in no way connected to our own, that our treat-
ment of them sounds no echoes beyond the chambers in which
they die. Such an illusion is ultimately corrosive, for the
reverberations of injustice are not so easily confined. "The
destinies of the two races in this country are indissolubly
linked together," *id.*, at 560 (Harlan, J., dissenting), and the
way in which we choose those who will die reveals the depth
of moral commitment among the living.

The Court's decision today will not change what attorneys
in Georgia tell other Warren McCleskeys about their chances
of execution. Nothing will soften the harsh message they
must convey, nor alter the prospect that race undoubtedly
will continue to be a topic of discussion. McCleskey's evi-

dence will not have obtained judicial acceptance, but that will not affect what is said on death row. However many criticisms of today's decision may be rendered, these painful conversations will serve as the most eloquent dissents of all.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, and with whom JUSTICE BRENNAN joins in all but Part IV–B, dissenting.

The Court today sanctions the execution of a man despite his presentation of evidence that establishes a constitutionally intolerable level of racially based discrimination leading to the imposition of his death sentence. I am disappointed with the Court's action not only because of its denial of constitutional guarantees to petitioner McCleskey individually, but also because of its departure from what seems to me to be well-developed constitutional jurisprudence.

JUSTICE BRENNAN has thoroughly demonstrated, *ante*, that, if one assumes that the statistical evidence presented by petitioner McCleskey is valid, as we must in light of the Court of Appeals' assumption,[1] there exists in the Georgia capital sentencing scheme a risk of racially based discrimination that is so acute that it violates the Eighth Amendment. His analysis of McCleskey's case in terms of the Eighth Amendment is consistent with this Court's recognition that because capital cases involve the State's imposition of a punishment that is unique both in kind and degree, the decision in such cases must reflect a heightened degree of reliability under the Amendment's prohibition of the infliction of cruel and unusual punishments. See *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion). I therefore join Parts II through V of JUSTICE BRENNAN's dissenting opinion.

---

[1] I agree with JUSTICE STEVENS' position that the proper course is to remand this case to the Court of Appeals for determination of the validity of the statistical evidence presented. *Post*, at 367. Like JUSTICE STEVENS, however, I am persuaded that the Baldus study is valid and would remand merely in the interest of orderly procedure.

Yet McCleskey's case raises concerns that are central not only to the principles underlying the Eighth Amendment, but also to the principles underlying the Fourteenth Amendment. Analysis of his case in terms of the Fourteenth Amendment is consistent with this Court's recognition that racial discrimination is fundamentally at odds with our constitutional guarantee of equal protection. The protections afforded by the Fourteenth Amendment are not left at the courtroom door. *Hill* v. *Texas*, 316 U. S. 400, 406 (1942). Nor is equal protection denied to persons convicted of crimes. *Lee* v. *Washington*, 390 U. S. 333 (1968) *(per curiam)*. The Court in the past has found that racial discrimination within the criminal justice system is particularly abhorrent: "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose* v. *Mitchell*, 443 U. S. 545, 555 (1979). Disparate enforcement of criminal sanctions "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." *Id.*, at 555–556. And only last Term JUSTICE POWELL, writing for the Court, noted: "Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.'" *Batson* v. *Kentucky*, 476 U. S. 79, 87–88 (1986), quoting *Strauder* v. *West Virginia*, 100 U. S. 303, 308 (1880).

Moreover, the legislative history of the Fourteenth Amendment reminds us that discriminatory enforcement of States' criminal laws was a matter of great concern for the drafters. In the introductory remarks to its Report to Congress, the Joint Committee on Reconstruction, which reported out the Joint Resolution proposing the Fourteenth Amendment, specifically noted: "This deep-seated prejudice against color . . . leads to acts of cruelty, oppression, and murder, which the local authorities are at no pains to prevent or punish." H. R. Joint Comm. Rep. No. 30, 39th Cong., 1st Sess., p. XVII (1866). Witnesses who testified before

the Committee presented accounts of criminal acts of violence against black persons that were not prosecuted despite evidence as to the identity of the perpetrators.[2]

## I

## A

The Court today seems to give a new meaning to our recognition that death is different.   Rather than requiring

[2] See, *e. g.*, H. R. Joint Comm. Rep. No. 30, 39th Cong., 1st Sess., pt. II, p. 25 (1866) (testimony of George Tucker, Virginia attorney) ("They have not any idea of prosecuting white men for offenses against colored people; they do not appreciate the idea"); *id.*, at 209 (testimony of Dexter H. Clapp) ("Of the thousand cases of murder, robbery, and maltreatment of freedmen that have come before me, . . . I have never yet known a single case in which the local authorities or police or citizens made any attempt or exhibited any inclination to redress any of these wrongs or to protect such persons"); *id.*, at 213 (testimony of J. A. Campbell) (although identities of men suspected of killing two blacks known, no arrest or trial had occurred); *id.*, pt. III, p. 141 (testimony of Brev. Maj. Gen. Wager Swayne) ("I have not known, after six months' residence at the capital of the State, a single instance of a white man being convicted and hung or sent to the penitentiary for crime against a negro, while many cases of crime warranting such punishment have been reported to me"); *id.*, pt. IV, p. 75 (testimony of Maj. Gen. George A. Custer) ("[I]t is of weekly, if not of daily, occurrence that freedmen are murdered. . . . [S]ometimes it is not known who the perpetrators are; but when that is known no action is taken against them.   I believe a white man has never been hung for murder in Texas, although it is the law").

In *Brown* v. *Board of Education*, 347 U. S. 483 (1954), this Court held that, despite the fact that the legislative history of the Fourteenth Amendment indicated that Congress did *not* view racial discrimination in public education as a specific target, the Amendment nevertheless prohibited such discrimination.   The Court today holds that even though the Fourteenth Amendment *was* aimed specifically at eradicating discrimination in the enforcement of criminal sanctions, allegations of such discrimination supported by substantial evidence are *not* constitutionally cognizable. But see *Batson* v. *Kentucky*, 476 U. S. 79, 85 (1986) (allegations of racially discriminatory exercise of peremptory challenges by prosecutor subject to review under Fourteenth Amendment because "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure").

"a correspondingly greater degree of scrutiny of the capital sentencing determination," *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983), the Court relies on the very fact that this is a case involving capital punishment to apply a *lesser* standard of scrutiny under the Equal Protection Clause. The Court concludes that "legitimate" explanations outweigh McCleskey's claim that his death sentence reflected a constitutionally impermissible risk of racial discrimination. The Court explains that McCleskey's evidence is too weak to require rebuttal "because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty." *Ante*, at 297. The Court states that it will not infer a discriminatory purpose on the part of the state legislature because "there were legitimate reasons for the Georgia Legislature to adopt and maintain capital punishment." *Ante*, at 298–299.

The Court's assertion that the fact of McCleskey's conviction undermines his constitutional claim is inconsistent with a long and unbroken line of this Court's case law. The Court on numerous occasions during the past century has recognized that an otherwise legitimate basis for a conviction does not outweigh an equal protection violation. In cases where racial discrimination in the administration of the criminal justice system is established, it has held that setting aside the conviction is the appropriate remedy. See, *e. g.*, *Rose* v. *Mitchell*, 443 U. S., at 559; *Whitus* v. *Georgia*, 385 U. S. 545, 549–550 (1967); *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). The Court recently reaffirmed the propriety of invalidating a conviction in order to vindicate federal constitutional rights. *Vasquez* v. *Hillery*, 474 U. S. 254 (1986). Invalidation of a criminal conviction on federal constitutional grounds does not necessarily preclude retrial and resentencing of the defendant by the State. *Hill* v. *Texas*, 316 U. S., at 406. The Court has maintained a *per se* reversal

rule rejecting application of harmless-error analysis in cases involving racial discrimination that "strikes at the fundamental values of our judicial system and our society as a whole." *Rose* v. *Mitchell*, 443 U. S., at 556. We have noted that a conviction "in no way suggests that the discrimination did not impermissibly infect" earlier phases of the criminal prosecution "and, consequently, the nature or very existence of the proceedings to come." *Vasquez* v. *Hillery*, 474 U. S., at 263. Hence, McCleskey's conviction and the imposition of his death sentence by the jury do not suggest that discrimination did not impermissibly infect the earlier steps in the prosecution of his case, such as the prosecutor's decision to seek the death penalty.

The Court's reliance on legitimate interests underlying the Georgia Legislature's enactment of its capital punishment statute is likewise inappropriate. Although that reasoning may be relevant in a case involving a facial challenge to the constitutionality of a statute, it has no relevance in a case dealing with a challenge to the Georgia capital sentencing system *as applied* in McCleskey's case. In *Batson* v. *Kentucky, supra,* we rejected such reasoning: "The Constitution requires . . . that we look beyond the face of the statute . . . and also consider challenged selection practices to afford 'protection against action of the State through its administrative officers in effecting the prohibited discrimination.'" 476 U. S., at 88, quoting *Norris* v. *Alabama*, 294 U. S. 587, 589 (1935).

### B

In analyzing an equal protection claim, a court must first determine the nature of the claim and the responsibilities of the state actors involved to determine what showing is required for the establishment of a prima facie case. *Castaneda* v. *Partida*, 430 U. S. 482, 493–494 (1977). The Court correctly points out: "In its broadest form, McCleskey's claim of discrimination extends to every actor in the Georgia capital sentencing process, from the prosecutor who

sought the death penalty and the jury that imposed the sentence, to the State itself that enacted the capital punishment statute and allows it to remain in effect despite its allegedly discriminatory application." *Ante*, at 292. Having recognized the complexity of McCleskey's claim, however, the Court proceeds to ignore a significant element of that claim. The Court treats the case as if it is limited to challenges to the actions of two specific decisionmaking bodies—the petit jury and the state legislature. *Ante*, at 294–295, 297–298. This self-imposed restriction enables the Court to distinguish this case from the venire-selection cases and cases under Title VII of the Civil Rights Act of 1964 in which it long has accepted statistical evidence and has provided an easily applicable framework for review. See *e. g., Castaneda* v. *Partida, supra; Bazemore* v. *Friday,* 478 U. S. 385 (1986) (BRENNAN, J., joined by all other Members of the Court, concurring in part). Considering McCleskey's claim in its entirety, however, reveals that the claim fits easily within that same framework. A significant aspect of ·his claim is that racial factors impermissibly affected numerous steps in the Georgia capital sentencing scheme between his indictment and the jury's vote to sentence him to death. The primary decisionmaker at each of the intervening steps of the process is the prosecutor, the quintessential state actor in a criminal proceeding.[3] The District Court expressly stated

---

[3] The Court refers to the prosecutor's role in the capital sentencing process without analyzing the import of the statistical evidence concerning the steps of the process at which the prosecutor determines the future of the case. The Court recognizes that the prosecutor determines whether a case even will proceed to the penalty phase. If the prosecutor does not pursue the death penalty, a mandatory sentence of life imprisonment is imposed. See *ante,* at 284, n. 2. It lists many of the factors that prosecutors take into account in making their decisions, *ante,* at 307–308, n. 28, and recognizes that in each case the prosecutor can decline to charge, or to offer a plea bargain, or to seek a death sentence, *ante,* at 312. It also notes that the Baldus study "found that prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims; 32%

that there were "two levels of the system that matter to [McCleskey], the decision to seek the death penalty and the decision to impose the death penalty." 580 F. Supp. 338, 379–380 (ND Ga. 1984). I agree with this statement of McCleskey's case. Hence, my analysis in this dissenting opinion takes into account the role of the prosecutor in the Georgia capital sentencing system. I certainly do not address all the alternative methods of proof in the Baldus study. Nor do I review each step in the process which McCleskey challenges. I concentrate on the decisions within the prosecutor's office through which the State decided to seek the death penalty and, in particular, the point at which the State proceeded to the penalty phase after conviction. This is a step at which the evidence of the effect of the racial factors was especially strong, see Supplemental Exhibits (Supp. Exh.) 56, 57; Transcript of Federal Habeas Corpus Hearing in No. C81–2434A (Tr.) 894–926, but is ignored by the Court.

## II

### A

A criminal defendant alleging an equal protection violation must prove the existence of purposeful discrimination. *Washington* v. *Davis*, 426 U. S. 229, 239–240 (1976); *Whitus* v. *Georgia*, 385 U. S., at 550. He may establish a prima facie case[4] of purposeful discrimination "by showing that the

---

of the cases involving white defendants and white victims; 15% of the cases involving black defendants and black victims; and 19% of the cases involving white defendants and black victims," *ante*, at 287.

The Court relies heavily on its assertion that prosecutorial discretion should not be reviewed, *ante*, at 296–297, 311–312, but elsewhere concedes that such discretion may not be exercised in a racially discriminatory manner, *ante*, at 309, n. 30. It nowhere explains why this limitation on prosecutorial discretion does not require the same analysis that we apply in other cases involving equal protection challenges to the exercise of prosecutorial discretion. See, *e. g.*, *Batson* v. *Kentucky*, 476 U. S. 79 (1986).

[4] The use of the prima facie case method to structure proof in cases charging racial discrimination is appropriate because it "progressively . . .

totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson* v. *Kentucky*, 476 U. S., at 94.[5] Once the defendant establishes a prima facie case, the burden shifts to the prosecution to rebut that case. "The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Ibid.* The State must demonstrate that the challenged effect was due to "'permissible racially neutral selection criteria.'" *Ibid.*, quoting *Alexander* v. *Louisiana*, 405 U. S. 625, 632 (1972).

Under *Batson* v. *Kentucky* and the framework established in *Castaneda* v. *Partida*, McCleskey must meet a three-factor standard. First, he must establish that he is a member of a group "that is a recognizable, distinct class, singled out for different treatment." 430 U. S., at 494. Second, he must make a showing of a substantial degree of differential treatment.[6] Third, he must establish that the allegedly

---

sharpen[s] the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 255, n. 8 (1981); see *McCleskey* v. *Kemp*, 753 F. 2d 877, 912 (CA11 1985) (Johnson, J., dissenting in part and concurring in part) (where the "prosecutor has considerable discretion and the jury has bounded but irreducible discretion," the discretion could easily mask conscious or unconscious racial discrimination and indirect methods of proof are therefore required as outlined in *Washington* v. *Davis*, 426 U. S. 229, 241–242 (1976), and *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266, n. 13 (1977)).

[5] The Court recently explained: "In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S., at 266. Circumstantial evidence of invidious intent may include proof of disproportionate impact. *Washington* v. *Davis*, 426 U. S., at 242. We have observed that under some circumstances proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.' *Ibid.*" *Batson* v. *Kentucky*, 476 U. S., at 93.

[6] In *Castaneda*, we explained that in jury-selection cases where the criminal defendant is attempting to prove that there was discriminatory

discriminatory procedure is susceptible to abuse or is not racially neutral. *Ibid.*

### B

There can be no dispute that McCleskey has made the requisite showing under the first prong of the standard. The Baldus study demonstrates that black persons are a distinct group that are singled out for different treatment in the Georgia capital sentencing system. The Court acknowledges, as it must, that the raw statistics included in the Baldus study and presented by petitioner indicate that it is much less likely that a death sentence will result from a murder of a black person than from a murder of a white person. *Ante*, at 286. White-victim cases are nearly 11 times more likely to yield a death sentence than are black-victim cases. Supp. Exh. 46. The raw figures also indicate that even within the group of defendants who are convicted of killing white persons and are thereby more likely to receive a death sentence, black defendants are more likely than white defendants to be sentenced to death. Supp. Exh. 47.

With respect to the second prong, McCleskey must prove that there is a substantial likelihood that his death sentence is due to racial factors. See *Hunter* v. *Underwood*, 471 U. S. 222, 228 (1985). The Court of Appeals assumed the validity of the Baldus study and found that it "showed that systemic and substantial disparities existed in the penalties imposed upon homicide defendants in Georgia based on race of the homicide victim, that the disparities existed at a less substantial rate in death sentencing based on race of defendants, and that the factors of race of the victim and defendant were at work in Fulton County." 753 F. 2d 877, 895 (CA11 1985).

exclusion of potential jurors we apply the "rule of exclusion" method of proof. 430 U. S., at 494. The underlying rationale is that "[i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Id.*, at 494, n. 13.

The question remaining therefore is at what point does that disparity become constitutionally unacceptable. See *Turner* v. *Murray*, 476 U. S. 28, 36, n. 8 (1986) (plurality opinion). Recognizing that additional factors can enter into the decisionmaking process that yields a death sentence, the authors of the Baldus study collected data concerning the presence of other relevant factors in homicide cases in Georgia during the time period relevant to McCleskey's case. They then analyzed the data in a manner that would permit them to ascertain the independent effect of the racial factors.[7]

McCleskey demonstrated the degree to which his death sentence was affected by racial factors by introducing multiple-

---

[7] Although the Court states that it assumes the validity of the Baldus study for purposes of its analysis, because of its detailed discussion of the District Court's reasons for rejecting its validity I am compelled to record my disagreement with the District Court's reasoning. As a member of the United States Court of Appeals, I was confronted in 1968 with a challenge to the constitutionality of a State's capital sentencing system based on allegations of racial discrimination supported by statistical evidence. Writing for a panel of the court, I rejected that challenge for reasons similar to those espoused by the Court today. *Maxwell* v. *Bishop*, 398 F. 2d 138 (CA8), vacated and remanded, *sua sponte*, on grounds not raised below, 398 U. S. 262 (1970) *(per curiam)*.

The Court of Appeals found the evidence presented by Maxwell incomplete, not directly relevant to his individual claim, and statistically insufficient. McCleskey's evidence, however, is of such a different level of sophistication and detail that it simply cannot be rejected on those grounds. Unlike the evidence presented by Maxwell, which did not contain data from the jurisdiction in which he was tried and sentenced, McCleskey's evidence includes data from the relevant jurisdiction. Whereas the analyses presented by Maxwell did not take into account a significant number of variables and were based on a universe of 55 cases, the analyses presented by McCleskey's evidence take into account more than 400 variables and are based on data concerning all offenders arrested for homicide in Georgia from 1973 through 1978, a total of 2,484 cases. Moreover, the sophistication of McCleskey's evidence permits consideration of the existence of racial discrimination at various decision points in the process, not merely at the jury decision. It is this experience, in part, that convinces me of the significance of the Baldus study.

regression analyses that explain how much of the statistical distribution of the cases analyzed is attributable to the racial factors. McCleskey established that because he was charged with killing a white person he was 4.3 times as likely to be sentenced to death as he would have been had he been charged with killing a black person. Petitioner's Exhibit DB 82. McCleskey also demonstrated that it was more likely than not that the fact that the victim he was charged with killing was white determined that he received a sentence of death—20 out of every 34 defendants in McCleskey's midrange category would not have been sentenced to be executed if their victims had been black. Supp. Exh. 54.[8] The most persuasive evidence of the constitutionally significant effect of racial factors in the Georgia capital sentencing system is McCleskey's proof that the race of the victim is more important in explaining the imposition of a death sentence than is the factor whether the defendant was a prime mover in the homicide. Petitioner's Exhibit DB 82.[9] Similarly, the race-of-victim factor is nearly as crucial as the statutory aggravating circumstance whether the defendant had a prior record of a conviction for a capital crime.[10] *Ibid.* See Ga. Code Ann. § 17–10–30(b) (1982), *ante*, at 284–285, n. 3. The Court has noted elsewhere that Georgia could not attach "the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant." *Zant* v. *Stephens*, 462 U. S. 862, 885 (1983). What we have held to be unconstitutional if included in the

---

[8] See Brief for Dr. Franklin M. Fisher et al. as *Amici Curiae* 19.

[9] A defendant's chances of receiving a death sentence increase by a factor of 4.3 if the victim is white, but only by 2.3 if the defendant was the prime mover behind the homicide.

[10] A prior record of a conviction for murder, armed robbery, rape, or kidnaping with bodily injury increases the chances of a defendant's receiving a death sentence by a factor of 4.9.

language of the statute surely cannot be constitutional because it is a *de facto* characteristic of the system.

McCleskey produced evidence concerning the role of racial factors at the various steps in the decisionmaking process, focusing on the prosecutor's decision as to which cases merit the death sentence. McCleskey established that the race of the victim is an especially significant factor at the point where the defendant has been convicted of murder and the prosecutor must choose whether to proceed to the penalty phase of the trial and create the possibility that a death sentence may be imposed or to accept the imposition of a sentence of life imprisonment. McCleskey demonstrated this effect at both the statewide level, see Supp. Exh. 56, 57, Tr. 897–910, and in Fulton County where he was tried and sentenced, see Supp. Exh. 59, 60, Tr. 978–981. The statewide statistics indicated that black-defendant/white-victim cases advanced to the penalty trial at nearly five times the rate of the black-defendant/black-victim cases (70% v. 15%), and over three times the rate of white-defendant/black-victim cases (70% v. 19%). See Supp. Exh. 56. The multiple-regression analysis demonstrated that racial factors had a readily identifiable effect at a statistically significant level. See *id.*, at 57; Tr. 905. The Fulton County statistics were consistent with this evidence although they involved fewer cases. See Supp. Exh. 59, 60.[11]

Individualized evidence relating to the disposition of the Fulton County cases that were most comparable to McCleskey's case was consistent with the evidence of the race-of-victim effect as well. Of the 17 defendants, including

---

[11] The universe of cases from Fulton County analyzed by Baldus included 629 killings, 581 of which yielded murder indictments. Supp. Exh. 59, 60; Tr. 978–981. The evidence indicated that at each step in the process from indictment to sentence, there is a differential treatment in the disposition of white-victim and black-victim cases, with the white-victim cases having a higher likelihood of being retained in the system and risking a death sentence. Supp. Exh. 60; Tr. 978–981.

McCleskey, who were arrested and charged with homicide of a police officer in Fulton County during the 1973–1979 period, McCleskey, alone, was sentenced to death. The only other defendant whose case even proceeded to the penalty phase received a sentence of life imprisonment. That defendant had been convicted of killing a black police officer. See *id.*, at 61–63; Tr. 1050–1062.

As to the final element of the prima facie case, McCleskey showed that the process by which the State decided to seek a death penalty in his case and to pursue that sentence throughout the prosecution was susceptible to abuse. Petitioner submitted the deposition of Lewis R. Slaton, who, as of the date of the deposition, had been the District Attorney for 18 years in the county in which McCleskey was tried and sentenced. Deposition in No. 84–8176 of Lewis R. Slaton, Aug. 4, 1983, p. 5; see *McCleskey* v. *Zant*, 580 F. Supp. 338, 377, n. 15 (1984); Tr. 1316. As Mr. Slaton explained, the duties and responsibilities of that office are the prosecution of felony charges within the Atlanta Judicial Circuit that comprises Fulton County. Deposition 7–8. He testified that during his years in the office, there were no guidelines informing the Assistant District Attorneys who handled the cases how they should proceed at any particular stage of the prosecution. There were no guidelines as to when they should seek an indictment for murder as opposed to lesser charges, *id.*, at 10–11; when they should recommend acceptance of a guilty plea to murder, acceptance of a guilty plea to a lesser charge, reduction of charges, or dismissal of charges at the postindictment-preconviction stage, *id.*, at 25–26, 31; or when they should seek the death penalty, *id.*, at 31. Slaton testified that these decisions were left to the discretion of the individual attorneys who then informed Slaton of their decisions as they saw fit. *Id.*, at 13, 24–25, 37–38.

Slaton's deposition proves that, at every stage of a prosecution, the Assistant District Attorney exercised much discretion. The only guidance given was "on-the-job training."

*Id.*, at 20. Addressing plea bargaining, for example, Slaton stated that "through the training that the assistant DA's get, I think we pretty much think alike on the cases, on what we suggest." *Id.*, at 25. The sole effort to provide any consistency was Slaton's periodic pulling of files at random to check on the progress of cases. *Id.*, at 28–29. Slaton explained that as far as he knew, he was the only one aware of this checking. *Id.*, at 28. The files contained information only as to the evidence in the case, not any indication as to why an attorney made a particular decision. The attorneys were not required to record why they sought an indictment for murder as opposed to a lesser charge, *id.*, at 19, or why they recommended a certain plea, *id.*, at 29–30.[12] The attorneys were not required to report to Slaton the cases in which they decided not to seek the death penalty, *id.*, at 34–36, 38, or the cases in which they did seek the death penalty, *id.*, at 41.

When questioned directly as to how the office decided whether to seek the death penalty, Slaton listed several factors he thought relevant to that decision, including the strength of the evidence, the atrociousness of the crime, and the likelihood that a jury would impose the death sentence. *Id.*, at 59. He explained that the attorneys did not seek the death penalty in every case in which statutory aggravating factors existed. *Id.*, at 38–39. Slaton testified that his office still operated in the same manner as it did when he took office in 1965, except that it has not sought the death penalty in any rape cases since this Court's decision in *Coker* v. *Georgia*, 433 U. S. 584 (1977). Deposition 60.

In addition to this showing that the challenged system was susceptible to abuse, McCleskey presented evidence of the

---

[12] In his deposition, Russell Parker, the Assistant District Attorney who prosecuted McCleskey's case, contradicted the statement cited by the Court, *ante*, at 312, n. 34, concerning plea negotiations during McCleskey's trial. Parker testified that he never discussed a plea with McCleskey. Deposition in No. 84–8176 of Russell Parker, Feb. 16, 1981, p. 15.

history of prior discrimination in the Georgia system. JUS-
TICE BRENNAN has reviewed much of this history in detail
in his dissenting opinion, *ante*, at 328–334, including the
history of Georgia's racially based dual system of criminal
justice. This historical background of the state action chal-
lenged "is one evidentiary source" in this equal protection
case. *Arlington Heights* v. *Metropolitan Housing Develop-
ment Corp.*, 429 U. S. 252, 267 (1977); see also *Rogers* v.
*Lodge*, 458 U. S. 613, 618, 623–625 (1982). Although I would
agree that evidence of "official actions taken long ago" could
not alone establish that the current system is applied in an
unconstitutionally discriminatory manner, I disagree with
the Court's statement that such evidence is now irrelevant.
*Ante*, at 298, n. 20.

The above-described evidence, considered in conjunction
with the other record evidence outlined by JUSTICE BREN-
NAN, *ante*, at 325–328, and discussed in opinions dissenting
from the judgment of the Court of Appeals, 753 F. 2d, at 919
(Hatchett, J., dissenting in part and concurring in part); *id.*,
at 920–923 (Clark, J., dissenting in part and concurring in
part), gives rise to an inference of discriminatory purpose.
See *Washington* v. *Davis*, 426 U. S., at 239–242. As in the
context of the rule of exclusion, see n. 6, *supra*, McCleskey's
showing is of sufficient magnitude that, absent evidence to
the contrary, one must conclude that racial factors entered
into the decisionmaking process that yielded McCleskey's
death sentence. See *Castaneda* v. *Partida*, 430 U. S., at
494, n. 13. The burden, therefore, shifts to the State to ex-
plain the racial selections. It must demonstrate that legiti-
mate racially neutral criteria and procedures yielded this ra-
cially skewed result.

In rebuttal, the State's expert suggested that if the Baldus
thesis was correct then the aggravation level in black-victim
cases where a life sentence was imposed would be higher
than in white-victim cases. See 580 F. Supp., at 373. The
expert analyzed aggravating and mitigating circumstances

"one by one, demonstrating that in life sentence cases, to the extent that any aggravating circumstance is more prevalent in one group than the other, there are more aggravating features in the group of white-victim cases than in the group of black-victim cases. Conversely, there were more mitigating circumstances in which black-victim cases had a higher proportion of that circumstance than in white-victim cases." *Ibid.* The District Court found that the State's suggestion was plausible. It concluded, however, that the State did not conclusively disprove McCleskey's case; yet it reasoned that the State's theory "stands to contradict any prima facie case." *Ibid.* I find that reasoning wrong as a matter of law, and the conclusion clearly erroneous.

The State did not test its hypothesis to determine if white-victim and black-victim cases at the same level of aggravating circumstances were similarly treated. Tr. 1613–1614, 1664. McCleskey's experts, however, performed this test on their data. *Id.*, at 1297, 1729–1732, 1756–1761. They demonstrated that the racial disparities in the system were not the result of the differences in the average aggravation levels between white-victim and black-victim cases. See Supp. Exh. 72; Tr. 1291–1296; Petitioner's Exhibit DB 92. The State's meager and unsophisticated evidence cannot withstand the extensive scrutiny given the Baldus evidence.[18]

---

[18] As a result of McCleskey's discovery efforts, the record also contains relevant testimonial evidence by two state officials. The Fulton County District Attorney testified that he did not recall any instance in which race was a factor in a death penalty case in his office. Deposition in No. 84–8176 of Lewis R. Slaton, Aug. 4, 1983, p. 78. He later recalled one case that was in the office when he first began, in which the office set aside the death penalty because of the possibility that race had been involved. *Id.*, at 79–80. The Assistant District Attorney who prosecuted McCleskey's case testified that race did not influence his decision to seek the death penalty in the present case. Deposition of Russell Parker, Feb. 16, 1981, p. 17.

These general assertions by state officials that they did not discriminate or that they properly performed their official duties, however, cannot meet

Here, as in *Bazemore* v. *Friday*, the State did not "demonstrate that when th[e] factors were properly organized and accounted for there was no significant disparity" between the death sentences imposed on defendants convicted of killing white victims and those imposed on defendants convicted of killing black victims. 478 U. S., at 403–404, n. 14. In *Castaneda*, we rejected a similar effort by the State to rely on an unsupported countervailing theory to rebut the evidence. 430 U. S., at 500. In sum, McCleskey has demonstrated a clear pattern of differential treatment according to race that is "unexplainable on grounds other than race." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S., at 266.

## III

The Court's explanations for its failure to apply this well-established equal protection analysis to this case are not persuasive. It first reasons that "each particular decision to impose the death penalty is made by a petit jury" and that the "application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII

---

the State's burden of rebuttal of the prima facie case. See *Alexander* v. *Louisiana*, 405 U. S. 625, 631–632 (1972); *Whitus* v. *Georgia*, 385 U. S. 545, 551–552 (1967). Moreover, there are many ways in which racial factors can enter indirectly into prosecutorial decisions. For example, the authors of a study similar to that of Baldus explained: "Since death penalty prosecutions require large allocations of scarce prosecutorial resources, prosecutors must choose a small number of cases to receive this expensive treatment. In making these choices they may favor homicides that are visible and disturbing to the majority of the community, and these will tend to be white-victim homicides." Gross & Mauro, Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization, 37 Stan. L. Rev. 27, 106–107 (1984); see generally Johnson, Race and the Decision to Detain a Suspect, 93 Yale L. J. 214 (1983); Lawrence, The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317 (1987).

case." *Ante*, at 294–295. According to the Court, the statistical evidence is less relevant because, in the two latter situations, there are fewer variables relevant to the decision and the "statistics relate to fewer entities." *Ante*, at 295.

I disagree with the Court's assertion that there are fewer variables relevant to the decisions of jury commissioners or prosecutors in their selection of jurors, or to the decisions of employers in their selection, promotion, or discharge of employees. Such decisions involve a multitude of factors, some rational, some irrational. Second, I disagree with the comment that the venire-selection and employment decisions are "made by fewer entities." Certainly in the employment context, personnel decisions are often the product of several levels of decisionmaking within the business or government structure. The Court's statement that the decision to impose death is made by the petit jury also disregards the fact that the prosecutor screens the cases throughout the pretrial proceedings and decides to seek the death penalty and to pursue a capital case to the penalty phase where a death sentence can be imposed. McCleskey's claim in this regard lends itself to analysis under the framework we apply in assessing challenges to other prosecutorial actions. See *Batson* v. *Kentucky*, 476 U. S. 79 (1986); see also *Wayte* v. *United States*, 470 U. S. 598, 608, n. 10 (1985) (applying *Castaneda* framework in challenge to prosecutor's allegedly selective enforcement of criminal sanction). It is appropriate to judge claims of racially discriminatory prosecutorial selection of cases according to ordinary equal protection standards. 470 U. S., at 608.

The Court's other reason for treating this case differently from venire-selection and employment cases is that in these latter contexts, "the decisionmaker has an opportunity to explain the statistical disparity," but in the instant case the State had no practical opportunity to rebut the Baldus study. *Ante*, at 296. According to the Court, this is because jurors cannot be called to testify about their verdict and because

policy considerations render it improper to require "prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *Ibid.*, quoting *Imbler* v. *Pachtman*, 424 U. S. 409, 425 (1976).

I agree with the Court's observation as to the difficulty of examining the jury's decisionmaking process. There perhaps is an inherent tension between the discretion accorded capital sentencing juries and the guidance for use of that discretion that is constitutionally required. In his dissenting opinion, JUSTICE BRENNAN demonstrates that the Eighth Amendment analysis is well suited to address that aspect of the case. *Ante*, at 323. The Court's refusal to require that the prosecutor provide an explanation for his actions, however, is completely inconsistent with this Court's longstanding precedents. The Court misreads *Imbler* v. *Pachtman*. In that case, the Court held that a prosecutor who acted within the scope of his duties was entitled to absolute immunity in an action under 42 U. S. C. § 1983 for *damages*. We recognized that immunity from damages actions was necessary to prevent harassing litigation and to avoid the threat of civil litigation undermining the prosecutor's independence of judgment. We clearly specified, however, that the policy considerations that compelled civil immunity did not mean that prosecutors could not be called to answer for their actions. We noted the availability of both criminal sanctions and professional ethical discipline. 424 U. S., at 429. Prosecutors undoubtedly need adequate discretion to allocate the resources of their offices and to fulfill their responsibilities to the public in deciding how best to enforce the law, but this does not place them beyond the constraints imposed on state action under the Fourteenth Amendment. Cf. *Ex parte Virginia*, 100 U. S. 339 (1880) (upholding validity of conviction of state judge for discriminating on the basis of race in his selection of jurors).

The Court attempts to distinguish the present case from *Batson* v. *Kentucky*, in which we recently reaffirmed the fact

that prosecutors' actions are not unreviewable. See *ante*, at 296, n. 17. I agree with the Court's observation that this case is "quite different" from the *Batson* case. *Ibid.* The irony is that McCleskey presented proof in this case that would have satisfied the more burdensome standard of *Swain* v. *Alabama*, 380 U. S. 202 (1965), a standard that was described in *Batson* as having placed on defendants a "crippling burden of proof." 476 U. S., at 92. As discussed above, McCleskey presented evidence of numerous decisions impermissibly affected by racial factors over a significant number of cases. The exhaustive evidence presented in this case certainly demands an inquiry into the prosecutor's actions.

The Court's assertion that, because of the necessity of discretion in the criminal justice system, it "would demand exceptionally clear proof," *ante*, at 297, before inferring abuse of that discretion thus misses the point of the constitutional challenge in this case. Its conclusory statement that "the capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law,'" *ante*, at 311–312, quoting 2 W. LaFave & J. Israel, Criminal Procedure § 13.2(a), p. 160 (1984), is likewise not helpful. The issue in this case is the extent to which the constitutional guarantee of equal protection limits the discretion in the Georgia capital sentencing system. As the Court concedes, discretionary authority can be discriminatory authority. *Ante*, at 312. Prosecutorial decisions may not be "'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Bordenkircher* v. *Hayes*, 434 U. S. 357, 364 (1978), quoting *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962). Judicial scrutiny is particularly appropriate in McCleskey's case because "[m]ore subtle, less consciously held racial attitudes could also influence" the decisions in the Georgia capital sentencing system. *Turner* v. *Murray*, 476 U. S. 28, 35 (1986); see n. 13, *supra*. The Court's rejection of McCleskey's equal protection claims is

a far cry from the "sensitive inquiry" mandated by the Constitution.

## IV

### A

One of the final concerns discussed by the Court may be the most disturbing aspect of its opinion.   Granting relief to McCleskey in this case, it is said, could lead to further constitutional challenges.   *Ante,* at 314–319.   That, of course, is no reason to deny *McCleskey* his rights under the Equal Protection Clause.   If a grant of relief to him were to lead to a closer examination of the effects of racial considerations throughout the criminal justice system, the system, and hence society, might benefit.   Where no such factors come into play, the integrity of the system is enhanced.   Where such considerations are shown to be significant, efforts can be made to eradicate their impermissible influence and to ensure an evenhanded application of criminal sanctions.

### B

Like JUSTICE STEVENS, I do not believe acceptance of McCleskey's claim would eliminate capital punishment in Georgia.   *Post,* at 367.   JUSTICE STEVENS points out that the evidence presented in this case indicates that in extremely aggravated murders the risk of discriminatory enforcement of the death penalty is minimized.   *Ibid.*   I agree that narrowing the class of death-eligible defendants is not too high a price to pay for a death penalty system that does not discriminate on the basis of race.   Moreover, the establishment of guidelines for Assistant District Attorneys as to the appropriate basis for exercising their discretion at the various steps in the prosecution of a case would provide at least a measure of consistency.   The Court's emphasis on the procedural safeguards in the system ignores the fact that there are none whatsoever during the crucial process leading up to trial.   As JUSTICE WHITE stated for the plurality in *Turner* v. *Murray,* I find "the risk that racial prejudice may

have infected petitioner's capital sentencing unacceptable in light of the ease with which that risk could have been minimized." 476 U. S., at 36. I dissent.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

There "is a qualitative difference between death and any other permissible form of punishment," and hence, "'a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Zant* v. *Stephens*, 462 U. S. 862, 884–885 (1983), quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion of Stewart, POWELL, and STEVENS, JJ.). Even when considerations far less repugnant than racial discrimination are involved, we have recognized the "vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U. S. 349, 358 (1977). "[A]lthough not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." *Zant, supra,* at 885.

In this case it is claimed—and the claim is supported by elaborate studies which the Court properly assumes to be valid—that the jury's sentencing process was likely distorted by racial prejudice. The studies demonstrate a strong probability that McCleskey's sentencing jury, which expressed "the community's outrage—its sense that an individual has lost his moral entitlement to live," *Spaziano* v. *Florida*, 468 U. S. 447, 469 (1984) (STEVENS, J., dissenting)—was influenced by the fact that McCleskey is black and his victim was white, and that this same outrage would not have been generated if he had killed a member of his own race. This sort of disparity is constitutionally intolerable. It flagrantly violates the Court's prior "insistence that capital punishment be

imposed fairly, and with reasonable consistency, or not at all." *Eddings* v. *Oklahoma,* 455 U. S. 104, 112 (1982).

The Court's decision appears to be based on a fear that the acceptance of McCleskey's claim would sound the death knell for capital punishment in Georgia. If society were indeed forced to choose between a racially discriminatory death penalty (one that provides heightened protection against murder "for whites only") and no death penalty at all, the choice mandated by the Constitution would be plain. *Eddings* v. *Oklahoma, supra.* But the Court's fear is unfounded. One of the lessons of the Baldus study is that there exist certain categories of extremely serious crimes for which prosecutors consistently seek, and juries consistently impose, the death penalty without regard to the race of the victim or the race of the offender. If Georgia were to narrow the class of death-eligible defendants to those categories, the danger of arbitrary and discriminatory imposition of the death penalty would be significantly decreased, if not eradicated. As JUSTICE BRENNAN has demonstrated in his dissenting opinion, such a restructuring of the sentencing scheme is surely not too high a price to pay.

Like JUSTICE BRENNAN, I would therefore reverse the judgment of the Court of Appeals. I believe, however, that further proceedings are necessary in order to determine whether McCleskey's death sentence should be set aside. First, the Court of Appeals must decide whether the Baldus study is valid. I am persuaded that it is, but orderly procedure requires that the Court of Appeals address this issue before we actually decide the question. Second, it is necessary for the District Court to determine whether the particular facts of McCleskey's crime and his background place this case within the range of cases that present an unacceptable risk that race played a decisive role in McCleskey's sentencing.

Accordingly, I respectfully dissent.